AMERICAN TYPE CULTURE COLLECTION, INC., Appellant,

v.

Marshall COLEMAN, et al., Appellees.*

No. 01–99–00045–CV.

Court of Appeals of Texas, Houston (1st Dist.).

May 18, 2000.

Opinion Overruling Rehearing Aug. 31, 2000.

---

* A complete list of all appellees appears in appendices A and B of appellant's brief.

Randy E. Moore, Lake Jackson, Gordon R. Pate, Joe Michael Dodson, Beaumont, Kathy D. Patrick, Jennifer Horan Greer, Andrew L. Pickens, John Albert Basinger, Houston, for appellant.

Francis I. Spagnoletti, James T. Liston, Houston, for appellee.

Panel consists of Justices COHEN, NUCHIA, and DUGGAN.[1]

### OPINION

MURRY B. COHEN, Justice.

American Type Culture Collection, Inc. ("ATCC") takes this interlocutory appeal from an order denying its special appearance. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(7) (Vernon Supp.2000). We consider whether a mail-order company that does not advertise locally in, has no physical presence in, and performs all services outside Texas may *nonetheless be*

---

1. The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

subject to general personal jurisdiction in Texas when, among other things, Texas is its sixth largest market in the United States. Concluding it can under the evidence presented, we affirm.

## I. Factual and Procedural Background

Appellees are veterans of the 1991 Persian Gulf War and some of their family members. Of the nearly 1800 plaintiffs in this case, about 185 live in Texas. Appellees allege ATCC, one of over 80 defendants, sold Iraq dangerous pathogens that were later used in weapons against the appellees who served in that war.

In June 1994, appellees sued the defendants in Brazoria County, Texas on theories of negligence and product liability. ATCC made a special appearance. The defendants removed the case to federal court, where ATCC moved to dismiss for lack of personal jurisdiction, but Judge Kent dismissed the entire case for lack of subject-matter jurisdiction. *Coleman v. Alcolac et al.*, 888 F.Supp. 1388, 1404 (S.D.Tex. 1995) (order granting motion to dismiss for lack of subject-matter jurisdiction and remanding cause to state court).

On remand, ATCC again urged its special appearance. In December 1998, the trial judge denied ATCC's special appearance without filing fact findings or legal conclusions. ATCC appeals, arguing in four points of error that the trial judge erred.

## II. Standard of Review and Burden of Proof

The burden of proof was on ATCC to negate all possible grounds for personal jurisdiction. *Garner v. Furmanite Australia Pty., Ltd.*, 966 S.W.2d 798, 802 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). Existence of personal jurisdiction is a question of law, but that determination must sometimes be preceded by the resolution of underlying factual disputes. *James v. Illinois Cent. R.R. Co.*, 965 S.W.2d 594, 596 (Tex.App.—Houston [1st Dist.] 1998, no pet.). When, as here, the trial judge files no fact findings, we presume all factual disputes were resolved to support the judge's order. *Garner*, 966 S.W.2d at 802. While we generally review for factual sufficiency, we review de novo if the underlying facts are undisputed or otherwise established. *C–Loc Retention Sys., Inc. v. Hendrix*, 993 S.W.2d 473, 476 (Tex. App.—Houston [14th Dist.] 1999, no pet.). Many of the facts here are undisputed, although the parties place greatly different significance on them.

## III. Jurisdictional Test

■ A court may assert personal jurisdiction over a nonresident defendant only if the requirements of both the Fourteenth Amendment's due process clause [2] and the Texas long-arm statute [3] are satisfied. *CSR, Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex.1996) (orig.proceeding). Because the Texas long-arm statute reaches "as far as the federal constitutional requirements of due process will allow," the statute is satisfied if the exercise of personal jurisdiction comports with federal due process. *Id.*

■ Federal due process requirements are two-fold. First, the nonresident defendant must have purposefully established such minimum contacts with the forum that it could reasonably anticipate being sued there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985). If the nonresident defendant has purposefully availed itself of the privileges and benefits of conducting business in a state, it has sufficient contacts to confer personal jurisdiction. *Id.* Random, fortuitous, or attenuated contacts do not suffice. *Id.* Neither do unilateral actions by third parties claiming some relationship with the nonresident defendant. *Id.* It is the quality

---

2. U.S. Const. amend. XIV, § 1.

3. Tex. Civ. Prac. & Rem.Code Ann. § 17.042 (Vernon 1997).

and nature of the contacts, rather than their number, that is important. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 230 n. 11 (Tex.1991).

Minimum contacts analysis is further divided into general and specific personal jurisdiction. *CSR, Ltd.*, 925 S.W.2d at 595. The parties agree this is a case of general personal jurisdiction,[4] which requires ATCC to show its contacts in Texas were not continuous and systematic. *Id.* To support a finding of general jurisdiction, the defendant's forum activities must have been "substantial," which requires stronger evidence of contacts than for specific personal jurisdiction.[5] *Id.*

Second, if the nonresident defendant has purposefully established minimum contacts with the forum, the exercise of jurisdiction must comport with fair play and substantial justice. *Burger King Corp.*, 471 U.S. at 477, 105 S.Ct. 2174, 2184; *Guardian Royal*, 815 S.W.2d at 231.

## IV. Jurisdictional Facts

The following evidence was adduced at the special appearance hearing.

ATCC is a non-profit corporation, organized under the laws of the District of Columbia, and having its principal place of business in Maryland. ATCC serves as a long-term repository and distribution center for living microorganisms, viruses, and cell lines, which it makes available to scientists and researchers around the world. During the 1980s, ATCC sold materials to Iraqi governmental entities, apparently in compliance with then-existing regulations.

ATCC is not authorized by Texas to do business in Texas and has no registered agent for service of process in Texas. It does not have an office or other facilities, any real property, a bank account or telephone listing, or officers, directors, or employees in Texas. Neither does it recruit employees in Texas, unless Texas residents respond to its national employment advertisements. ATCC has no Texas distributors for its biological products. It does not control the research conducted by its customers. The evidence does not show that ATCC pays any taxes in Texas, but an ATCC representative testified that, if ATCC incurs any taxes here, it would be sales taxes for Texas goods ATCC buys.

### A. ATCC's Advertising and Sales Methods

ATCC sells its biological materials to customers throughout the United States, including Texas, and in 45 countries. It is basically a mail-order company. Accordingly, all service to Texas is by telephone or mail. ATCC does not make in-person sales visits anywhere. ATCC ships its materials F.O.B. ("free on board"), Rockville, Maryland. ATCC sends its bills from Maryland, and its customers send payments to Maryland.

ATCC advertises only in national and international periodicals. ATCC's biological research materials are listed in catalogues that are sent to customers or prospective customers only upon request. ATCC does not make unsolicited, targeted mailings of its catalogues to prospective Texas customers. ATCC maintains local Maryland and toll-free 800 numbers for customer inquiries.

### B. ATCC's Sales to Texas Residents

All Texas sales are made by phone or written order received by ATCC in Maryland. ATCC has sold its products to Texas residents for at least 18 years. The record contains over 2,500 pages of detailed invoice reports for ATCC's Texas

---

4. Because appellees concede no specific personal jurisdiction exists, we need not consider ATCC's point of error one, which claims no specific personal jurisdiction exists over it.

5. Specific personal jurisdiction exists if the defendant's alleged liability arises from or is related to a specific activity conducted within the forum. *CSR, Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex.1996) (orig.proceeding).

customers, dating from 1989 to 1994; many of those companies are repeat customers. ATCC's officer conceded that ATCC's sales to Texas are not sporadic, but are "repetitive" on a monthly basis. When this lawsuit was filed, Texas sales accounted for about 3.5 percent of ATCC's worldwide sales (in the U.S. and 45 countries) and about five percent of its U.S. sales, making Texas ATCC's sixth biggest U.S. sales market and generating about $350,000 annually.

## C. Other Services to Texas Residents

ATCC also serves as a repository for researchers seeking microorganism patents. Its patent repository is located in Rockville, Maryland, and those using that service ship their materials there. For the 15 to 20–year period before this lawsuit, approximately 2.7 percent of the 13,000 patent deposits in ATCC's repository came from Texas customers. In connection with these services, ATCC apparently enters into customer safe-deposit agreements. The record contains a few examples of correspondence notifying a Texas customer that its safe-deposit agreements were expiring, explaining how to renew those agreements, and enclosing a renewal contract already signed by ATCC.

The above are not ATCC's only services. For example, ATCC also offers (including to an unspecified number of Texas residents) "applied science" services, such as freeze-drying of microorganisms, microorganism identification, and the like. ATCC also puts on scientific workshops outside Texas. Additionally, ATCC issues quarterly newsletters and laboratory manuals upon request. ATCC does not state how many Texas residents requested these services.

## D. ATCC's Purchases from Texas Vendors

ATCC buys supplies and media from approximately 3,000 vendors worldwide. About 33 of these, or around 1.4 percent, are in Texas. ATCC does not state whether the 1.4 percent figure for Texas is high or low compared to its purchases in other states and countries. From 1989 to 1994, ATCC purchased supplies worth about $378,000 from its Texas vendors. Some of these supplies were shipped F.O.B. points in Texas.

## E. Specific Contracts with Texas Residents

In 1991, ATCC contracted with the University of Texas Southwestern Medical Center ("UT–SMC") to propagate and test cell lines at ATCC's Maryland facilities. ATCC signed the contract, which contained no choice-of-law or choice-of-forum provisions, in Maryland and then sent it to Texas for UT–SMC's signature. ATCC performed in Maryland,[6] but it shipped the results to Texas. Total payment was $113,751, later increased to $183,740 by a 1992 amendment, which ATCC signed in Maryland and then sent for UT–SMC's signature. The contract ended in 1992.

ATCC requires prospective customers to consent to some restrictions on the use and distribution of certain materials before delivery. Consent is obtained by the customers' signing ATCC's standard "materials transfer agreement" ("MTA"). The MTA also makes the recipient responsible for injuries in connection with the receipt, handling, storage, or use of those particular materials. The record contains a set of MTAs signed by UT–SMC about four months after this lawsuit was filed in 1994. In these MTAs' standard language on recipient responsibilities, someone interlineated the following (in italics):

> It is also understood that although human cells distributed by the ATCC have been subjected to stringent tests and observations which indicate the absence of extraneous agents and deleterious properties that *to the extent authorized by the Constitution and laws of the State of Texas,* . . . [UT–SMC] agrees to

---

6. A small portion may have been subcontracted to a Virginia company.

be responsible for any claims, costs, damages, or expenses. . . .

In 1994, over three months after this lawsuit was filed, the City of Houston's Department of Health and Human Services executed a purchase order, submitted on its own form, requesting $890.52 of materials from ATCC.[7] ATCC filled this order in Maryland and sent it F.O.B. Maryland, as the City had requested. The City's purchase order form contained a Texas choice-of-law and choice-of-forum clause for any lawsuit connected with the order.

### F. Conferences in Texas

Between 1987 and 1994, ATCC employees attended five scientific conferences in Texas. The location of each conference had been chosen by the particular scientific society hosting the meeting, not by ATCC. At four of the conferences, ATCC had an exhibition booth, at which it distributed its literature, publications, brochures, and catalogues. Some of ATCC's highest-ranking representatives attended these conferences. One ATCC employee used his Texas visit to collect frozen cells from a "scientific collaborator" in a nearby city.

### V. Discussion

### A. Minimum Contacts and Purposeful Availment

In point of error two, ATCC argues Texas courts have no general personal jurisdiction over it because it did not purposefully avail itself of the privileges and benefits of conducting business in Texas on a continuous and systematic basis. In point of error four, ATCC argues that assertion of personal jurisdiction violates the federal Constitution's due process guarantees. We treat these points together.

### 1. Facts not Relevant to Personal Jurisdiction

■ We begin with the observation that two of the contracts on which appellees rely—the 1994 MTAs with UT–SMC and the 1994 purchase order from the City of Houston—were made after this lawsuit was filed. Federal authority indicates that contacts occurring after suit is filed are irrelevant because "district courts should examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances—up to and including the date the suit was filed—to assess whether they satisfy the 'continuous and systematic' standard." *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 569–70 (2nd Cir.1996); *see also Noonan v. Winston Co.,* 135 F.3d 85, 94–95 (1st Cir.1998); *Asarco, Inc. v. Glenara, Ltd.,* 912 F.2d 784, 787 n. 1 (5th Cir.1990); *Haas v. A.M. King Indus., Inc.,* 28 F.Supp.2d 644, 648 (D.Utah 1998). Some Texas authority implies that the relevant contacts are those up to the time of the injury. *See Scott v. Huey L. Cheramie, Inc.,* 833 S.W.2d 240, 242 (Tex.App.—Houston [14th Dist.] 1992, no writ); *Middleton v. Kawasaki Steel Corp.,* 687 S.W.2d 42, 45 (Tex.App.—Houston [14th Dist.] 1985), *writ ref'd n.r.e.,* 699 S.W.2d 199 (Tex.1985). Whether the cut-off date for determining general jurisdiction is the date of the injury or the date the suit is filed, the result is the same: these two contracts are irrelevant, and we do not consider them in our analysis.

### 2. Other Contracts with Texas Resident

■ *By itself,* UT–SMC's 1991 contract with ATCC to propagate and test cell lines does not weigh much in favor of finding personal jurisdiction. First, merely contracting with a Texas resident, without more, does not satisfy the minimum contacts requirement. *See, e.g., Magnolia Gas Co. v. Knight Equip. & Mfg. Corp.,* 994 S.W.2d 684, 691 (Tex.App.—San Antonio 1998, no pet.) (contract dispute; specif-

---

**7.** Appellees assert that the City was the seller and ATCC was the buyer, but the purchase

order unmistakably shows the opposite.

ic personal jurisdiction). Second, the contract's performance of propagating and testing cell lines took place in Maryland, although the results were shipped to Texas. Third, the contract contained no choice-of-law or choice-of-forum clauses. The first two observations are also true for ATCC's patent-repository and safe-deposit agreements with Texas residents.

ATCC has other contacts with Texas, however. ATCC also sells biological materials to and buys supplies from Texas residents. It provides "applied science" services and issues quarterly newsletters and laboratory manuals upon request, although it did not demonstrate how many Texas residents request or receive these services. Between 1987 and 1994, ATCC employees attended five scientific conferences in Texas and distributed literature, publications, brochures, and catalogues at four of them. Therefore, we will weigh the propagation, patent-repository, and safe-deposit contracts in the context of the jurisdictional facts discussed below.

### 3. ATCC's Attendance at Five Texas Conferences

Standing alone, ATCC's mere attendance at five conferences and trade shows in Texas would not be significant, as the location of each conference was decided entirely by the scientific group hosting the event, not by ATCC. *See Clark v. Noyes,* 871 S.W.2d 508, 519 (Tex.App.—Dallas 1994, no writ) (nonresident defendant doctor's attending and speaking at two national conferences in Texas insufficient to confer general personal jurisdiction over him); *see also National Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 774 (Tex. 1995) (orig.proceeding) (no general personal jurisdiction, although nonresident association's member attended one national conference in Texas). However, ATCC distributed marketing materials at four of these events. Additionally, as noted above, ATCC's attendance at these conferences was not ATCC's only Texas contact. Therefore, we will weigh ATCC's market-

ing at these conferences in the context of the jurisdictional facts discussed below.

### 4. ATCC's National and International Advertising

We conclude ATCC's advertising in national and international periodicals and its maintaining a toll-free 800 number do not, by themselves, weigh in favor of finding jurisdiction in Texas. *See Hayes v. Wissel,* 882 S.W.2d 97, 98–99 (Tex.App.—Fort Worth 1994, no writ) (no general or specific personal jurisdiction when, among other things, defendant advertised in international magazine, but not in Texas media); *Bearry v. Beech Aircraft Corp.,* 818 F.2d 370, 376 (5th Cir.1987) (holding nationwide advertising program did not result in general personal jurisdiction in Texas); *cf. C.W. Brown Mach. Shop, Inc. v. Stanley Machinery Corp.,* 670 S.W.2d 791, 792, 793–94 (Tex.App.—Fort Worth 1984, no writ) (no specific personal jurisdiction when, among other things, defendant had no direct mailings to Texas and advertised only in national magazines, but not in Texas media); *Myers v. Emery,* 697 S.W.2d 26, 32 (Tex.App.—Dallas 1985, no writ) (among others, fact that nonresident attorney advertised in *Martindale–Hubbell* did not create personal jurisdiction).

However, we reject any implication by ATCC that its being an international mail-order business and sending its catalogues only upon request *necessarily* insulates it from Texas jurisdiction. "Although territorial presence frequently will enhance a potential defendant's affiliation with the State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a state in which business is conducted. So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there."

*Burger King Corp.,* 471 U.S. at 476, 105 S.Ct. at 2184.

**5. Jurisdictional Implications of Shipping F.O.B.**

 We also note that, by shipping its materials F.O.B. Maryland, ATCC ensured title passed to the customer outside Texas. *See Computer Synergy Corp. v. Business Sys. Prod., Inc.,* 582 S.W.2d 573, 576 (Tex. Civ.App.—Houston [1st Dist.] 1979, no writ); *Sun–X Int'l Co. v. Witt,* 413 S.W.2d 761, 767 (Tex.Civ.App.—Texarkana 1967, writ ref'd n.r.e.). Title's passing outside Texas can weigh against finding personal jurisdiction in Texas. *See Link,* 925 S.W.2d at 594, 595.[8] The fact that title passes outside Texas is not dispositive, however. *C–Loc Retention,* 993 S.W.2d at 478 (specific personal jurisdiction); *Sun–X Int'l,* 413 S.W.2d at 767–68 (specific personal jurisdiction). Also, we note that invoices for some items ATCC bought from its Texas vendors show the items were shipped F.O.B. various *Texas* cities, meaning title passed to ATCC in Texas. Other invoices from ATCC's Texas purchases do not contain any F.O.B. information, and ATCC's brief does not refer to any evidence it produced showing the purchases were intended to be anything other than F.O.B. points in Texas.

Therefore, like the *C–Loc Retention* court, we will weigh delivery method in the context of the jurisdictional facts discussed below. *See id.,* 993 S.W.2d at 478.

**6. Application of the Law to the Remaining Jurisdictional Facts**

ATCC cites 11 cases to show no general personal jurisdiction exists over it. We distinguish each.

ATCC first relies on *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). This reliance is misplaced. In *Helicopteros,* the defendant ("Helicol"), a Colombian corporation providing helicopters to a joint venture that was constructing a Peruvian pipeline, was sued in Texas after the crash of its helicopter in Peru. *Id.,* 466 U.S. at 409–10, 104 S.Ct. at 1870. The joint venture had hired Helicol for flight services to the pipeline construction area. *Id.,* 466 U.S. at 410, 104 S.Ct. at 1870.

Helicol was not authorized to do business in Texas. Neither did it have an agent for process service, perform services or sell products, solicit business, keep or recruit employees, have shareholders, own real property, have an office, or keep records in Texas. *Id.,* 466 U.S. at 411, 104 S.Ct. at 1870–71. Its contract with the joint venture was executed in Peru, designated Peru as the dispute forum, and called for payments (which happened to be drawn on a Texas bank) to Helicol's New York bank account. *Id.,* 466 U.S. at 410–11, 104 S.Ct. at 1870. Helicol once visited the venture's Houston headquarters for the contract's negotiation. *Id.* Additionally, over seven years, Helicol bought about 80 percent of its helicopter fleet and accessories and spare parts for over $4 million from Bell Helicopter Company in Texas, had Bell train its pilots, and sent its personnel to visit Bell for "plant familiarization" and technical consultation. *Id.*

Nonetheless, the *Helicopteros* Court held Helicol was not subject to general personal jurisdiction in Texas. *Id.,* 466 U.S. at 418–19, 104 S.Ct. at 1874. After concluding the one trip to negotiate the contract was not continuous and systematic, and that Helicol's acceptance of payments drawn on a Texas bank was of negligible significance, the Court held as follows:

> [T]he Court's opinion in *Rosenberg Bros. & Co. v. Curtis Brown Co.,* 260 U.S. 516, 43 S.Ct. 170, 67 L.Ed. 372 (1923) (Brandeis, J., for a unanimous tribunal) makes clear *that purchases and related trips,*

---

**8.** *See also Computer Synergy Corp. v. Business Sys. Prod., Inc.,* 582 S.W.2d 573, 576 (Tex.Civ. App.—Houston [1st Dist.] 1979, no writ); *Walker v. Newgent,* 583 F.2d 163, 166 (5th Cir.1978); *Kern v. Jeppesen Sanderson, Inc.,* 867 F.Supp. 525, 536 (S.D.Tex.1994).

*standing alone,* are not a sufficient basis for a State's assertion of jurisdiction. . . .

\* \* \*

[W]e hold that *mere purchases,* even if occurring at regular intervals, are not enough to warrant a State's assertion of *in personam* jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions. Nor can we conclude that the fact Helicol sent personnel into Texas for training in connection with the purchase of helicopters and equipment in that State in any way enhanced the nature of Helicol's contacts with Texas. *The training was a part of the package of goods and services purchased by Helicol from Bell Helicopter.* The brief presence of Helicol employees in Texas for the purpose of attending the training sessions is no more a significant contact than were the trips to New York made by the buyer for the retail store in *Rosenberg.*[9]

*Id.,* 466 U.S. at 417–18, 104 S.Ct. at 1874 (underlined emphasis added).

The *Helicopteros* Court held that *mere purchases* from Texas residents—although numerous, long-term, and involving millions of dollars—did not suffice, *standing alone,* to confer jurisdiction. *Id.* The Court also relied on the fact that Helicol employees' visits to and training in Texas were part of a "package of goods and services," along with Helicol's purchases. *Id.*

■ In contrast, ATCC's sales were separate and discrete transactions, not part of a unified "package of goods and services." More importantly, ATCC did not just purchase from Texas residents: it also *sold* items and services to them, frequently and regularly. Although title passed to ATCC's Texas customers in Maryland, ATCC's Texas sales were numerous and repetitive, making Texas ATCC's sixth biggest U.S. sales market, despite constituting only about five percent of ATCC's U.S. sales. And while ATCC's Texas sales represented only about 3.5 percent of its worldwide business, ATCC has not directed us to evidence comparing its Texas sales volume to its sales volume in the 45 countries it sold to. For example, did ATCC's sales in any of these 45 countries top 3.5 percent of worldwide sales? We cannot know whether the figure for Texas is high or low compared to sales in nations outside the United States. Such a comparison, had ATCC made it, would have gone to whether ATCC could reasonably have anticipated being sued in Texas. Moreover, if Texas was ATCC's sixth biggest U.S. sales market despite generating only five percent of all ATCC's U.S. business, the trial judge could have reasonably inferred most jurisdictions, foreign or otherwise, generated a very low percentage of ATCC's overall business. Therefore, the trial judge could also have reasonably inferred the 3.5–percent figure was not insignificant. Finally, ATCC had sold to Texas customers, many of whom were repeat customers, for at least 18 years and in numbers that its officer admitted were not sporadic; these are not "random, fortuitous, or attenuated contacts." *See Burger King Corp.,* 471 U.S. at 475, 105 S.Ct. at 2184.

ATCC responds that numbers alone cannot confer jurisdiction over it and that its Texas contacts were not of a quality or nature sufficient to confer jurisdiction. *See Guardian Royal,* 815 S.W.2d at 230 n. 11 (holding quality and nature of contacts, rather than their number, is the important focus in minimum contacts analysis). But ATCC's sales *were* its business, or at least a major part of it. Therefore, they were significant not only for their number, but

---

**9.** The *Rosenberg* Court held that an Oklahoma corporation was not "present" in New York, for purposes of process service, when the corporation's only connection with New York was its purchasing there "from time to time" a large part of its merchandise and the occasional visits of its officers there to make those purchases. 260 U.S. 516, 518, 43 S.Ct. 170, 171, 67 L.Ed. 372 (1923).

for their quality and nature. The fact that title to the goods ATCC sold passed in Maryland does not alter our conclusion.

Against this backdrop, ATCC's marketing at four of five conferences in Texas and its propagation, safe-deposit, and patent-repository contracts with Texas residents, although comprising only about 2.7 percent of its repository business over a 20–year period and performed in Maryland, also weigh *slightly* in favor of finding personal jurisdiction. Further, ATCC does not state if it showed below whether 2.7 percent was a high or low figure compared to its repository business in other states or countries. Neither does ATCC state how many Texans requested or were provided its "applied science" services or newsletters and manuals. It was ATCC's burden to demonstrate whether Texas residents partook of these services and, if so, to what extent, to show it could not reasonably anticipate being sued in Texas. *See Garner*, 966 S.W.2d at 802 (defendant's burden to negate all possible grounds).

ATCC also relies on *Reyes v. Marine Drilling Cos.*, which in turn relied on *Helicopteros. Reyes*, 944 S.W.2d 401 (Tex. App.—Houston [14th Dist.] 1997, no writ). *Reyes* is distinguishable. In *Reyes*, a worker sued nonresident Ingalls Shipbuilding, Inc. for injuries he sustained on a rig it had designed. *Id.* at 402. Ingalls did not manufacture anything, have an office, station officers or employees, own or lease real property, market or distribute products, have a registered agent, pay taxes, or maintain bank accounts in Texas. *Id.* Like ATCC, it executed and performed its contracts outside Texas. *Id.* Unlike ATCC, which does not say if any of its contracts with Texas residents had choice-of-law clauses, Ingalls incorporated a Mississippi choice-of-law clause in all its contracts with Texas residents. *Id.*

Ingalls had purchased over $183,000,000 of goods from at least 471 Texas residents since 1987 and contracted for repairs with one Texas firm. *Id.* at 403. Ingalls had also contracted 303 times as purchaser

with a Conroe company and had solicited employees in five Texas periodicals since 1987. *Id.* Since 1990, Ingalls had sold Texas companies about $851,512 in scrap metal—an amount of sales the *Reyes* court considered only "isolated"—which Ingalls delivered in Mississippi. *Id.* at 403. Ingalls had also sent representatives to Texas at least 204 times to inspect potential vendors or to review items it was buying. *Id.* Despite all these contacts, the *Reyes* court held Ingalls had insufficient minimum contacts to establish general personal jurisdiction. *Id.* at 404–05.

*Reyes* does not control here. The *Reyes* court focused mainly on Ingalls's *purchases* from Texas residents; the court considered Ingalls's Texas sales "isolated" and noted Ingalls did not distribute its products in Texas. *Id.*, 944 S.W.2d at 402, 405. In contrast, ATCC's Texas sales were numerous and repetitive and made Texas a significant market for ATCC. Additionally, Ingalls's contracts expressly invoked Mississippi law, but ATCC did not show that its contracts invoked another state's law. Finally, while the *Reyes* court did not discuss this factor, we note that ATCC took title to at least some of its Texas purchases in Texas, by virtue of their being shipped F.O.B. points in Texas. *See Computer Synergy*, 582 S.W.2d at 576.

ATCC further relies on *Dominion Gas Ventures, Inc. v. N.L.S., Inc.*, which we distinguish. 889 F.Supp. 265 (N.D.Tex. 1995). The *Dominion Gas* court held that no general personal jurisdiction existed over a defendant in a contract breach suit when (1) the defendant's invoices for well cleaning and servicing work, which it performed for at least eight different companies in Texas, were only four to seven percent of its gross invoices two years ($70,000 value) and two percent of its gross invoices the next year ($22,359 value); (2) the majority of this work required only one employee and a few hours of labor; and (3) all communications occurred outside Texas or by phone or fax. *Id.* at 267–68. Here, in contrast, the first factor dif-

fers: ATCC's Texas sales were numerous and repetitive, amounting to $350,000 annually and making Texas ATCC's sixth biggest U.S. sales market. The *Dominion Gas* plaintiff (which, unlike appellees, had the burden to show personal jurisdiction in federal court) did not show this.

*Bearry v. Beech Aircraft Corp.*, on which ATCC next relies, is also distinguishable. In *Beech*, survivors of those killed in a Beech aircraft in Mississippi sued Beech in Texas on product liability theories. 818 F.2d at 372. Beech had engaged in a nationwide marketing campaign, during which nearly $250 million of its products had flowed to 17 independent Texas dealers. *Id.* Its representatives had occasionally visited Texas at the dealers' request. *Id.* at 373. Beech had also manufactured over $72 million of airframe assemblies for a Texas helicopter company (not a Beech independent dealer), with all products shipped F.O.B. Beech's facilities. *Id.* Additionally, Beech had bought over $195 million of goods and services from over 500 Texas vendors pursuant to contracts negotiated, and under which goods were accepted, outside Texas. *Id.* Nevertheless, the *Beech* court held that Beech did not have the systematic and continuous contacts needed to invoke general personal jurisdiction. *Id.* at 376.

*Beech* is distinguishable to the extent it was considering (1) whether the independent dealers' activities could be attributed to Beech; (2) whether Beech's relationship with those dealers could be considered; and (3) whether a "stream of commerce" theory supported jurisdiction. Those issues are not present here. It also differs because ATCC sent materials directly to Texas residents, while generally Beech sent its products through independent Texas dealers. A further distinction is that ATCC did not show that title to the Texas goods it bought regularly passed to it outside Texas (in fact, the record affirmatively shows that ATCC sometimes accepted goods shipped to it F.O.B. points in Texas). Finally, there is no indication in

*Beech* whether Beech built its airframe assemblies for the Texas helicopter company under many, separate contracts or under a few, "on-going" contracts. *See id.* at 373; *compare Helicopteros*, 466 U.S. at 417–18, 104 S.Ct. at 1874 (considering that the training nonresident's employees received in Texas was part of a "package of goods and services" under contract with one Texas company). Here, in contrast, there was evidence ATCC's Texas sales were numerous, repetitive, discrete transactions involving many Texas buyers; and while ATCC's Texas sales were much less than the $72 million in *Beech*, Texas was ATCC's sixth biggest U.S. sales market.

We likewise distinguish *Williams v. Wilson*, on which ATCC relies. 939 F.Supp. 543 (W.D.Tex.1995), *aff'd without op.*, 95 F.3d 1149 (5th Cir.1996). In *Williams*, a contract-breach case, the district court dismissed New York defendant Penthouse for lack of general personal jurisdiction when Penthouse had "derived monthly revenues from sales of ... numerous products in Texas" and circulated its magazine to Texas newsstands and direct-mail subscribers, but had no presence there. *Id.* at 549, 551. Penthouse's only Texas contacts were its magazine and product sales. *Id.* at 549. The plaintiff, unlike appellees, had the burden of proof, and she made no showing how Penthouse's Texas sales compared to those in other jurisdictions. *See id.* Here, the record contains that evidence for U.S. sales, and it shows Texas was a significant U.S. market for ATCC.

We distinguish *National Industrial Sand Association v. Gibson*, on which ATCC further relies, because the nonresident association's contacts there consisted only of (1) one member company's being a Texas resident, (2) periodic mailings to the entire membership, and (3) an association representative's one-time attendance at a Texas conference. 897 S.W.2d at 774. In contrast, ATCC's contacts cannot be reduced to mere membership mailings.

ATCC next relies on *Conner v. Conti-Carriers & Terminals, Inc.*, which we also

find distinguishable. 944 S.W.2d 405 (Tex. App.—Houston [14th Dist.] 1997, no writ) (plurality op.). Conner, a Louisiana resident, was injured in a boat collision on Mississippi waters. *Id.* at 409. Conner was an employee of the boat's operator, ContiCarriers. *Id.* ContiCarriers was authorized to do business in, had a designated agent for service in, and filed franchise taxes in Texas, but had no assets, headquarters, accounts, or advertisements there; it had one Texas employee; it was once sued in Texas; of its 500 to 600 barges operated annually, only 10 to 12 "ended up" in Texas at customers' request, because Texas was never the original destination of its barges; its barge business in Texas generated less than one fourth of one percent of ContiCarriers's total revenue over two years; and ContiCarriers often refused requests to take barges to Texas because it did not "do business" there and had nothing to haul back. *Id.* at 417–18. Conner and his wife sued ContiCarriers, its parent, and the operator of the other vessel in Texas for Conner's personal injuries. *Id.* at 409. The trial judge granted ContiCarriers's special appearance, and the court of appeals affirmed. *Id.* at 409, 420.

This is simply not a case like *Conner.* Unlike ContiCarriers, ATCC sold to Texas residents and shipped its materials directly to them upon request, albeit F.O.B. Maryland; that is, its products' destination was Texas. ATCC did not avoid Texas—or any other state or country for that matter—as did ContiCarriers: ATCC's annual Texas sales were numerous, repetitive, and made Texas ATCC's sixth biggest U.S. sales market, despite representing only five percent of all U.S. business. Moreover, as noted above, although ATCC's Texas sales were only 3.5 percent of its worldwide business, ATCC did not show whether this was a high or low figure compared to its sales in the 45 countries to which it sold materials. In contrast, ContiCarriers showed its Texas revenue was low compared to that generated in other states. *Id.* at 417.

Next, ATCC relies on *Siemer v. Learjet Acquisition Corp.,* which we find does not control. 966 F.2d 179 (5th Cir.1992). The *Siemer* plaintiffs sued Learjet for the wrongful death of those killed aboard its aircraft that crashed overseas. *Id.* at 180. The plaintiffs and decedents were residents of Greece; the aircraft was operated by a Greek company and permanently based and serviced there; it was not designed or manufactured in Texas, ever repaired or serviced there, or ever owned by a Texan; Learjet was a Delaware corporation whose only physical presence in Texas was a designated corporate agent; all Learjet's sales were made from products warehoused outside Texas; only about one percent of Learjet's sales were to Texas residents; Learjet advertised in national journals distributed in Texas; and Learjet occasionally mailed information to prospective customers in Texas. *Id.* at 180–81. The trial judge dismissed the claims against Learjet for lack of general personal jurisdiction, and the Fifth Circuit court of appeals affirmed. *Id.* at 180, 184.

Only about one percent of Learjet's sales were to Texas residents. *Id.* at 181. While there was no indication how this percentage compared to Learjet's sales in other countries, we note that the *plaintiff* in federal court has the burden to show personal jurisdiction. *Gardemal v. Westin Hotel Co.,* 186 F.3d 588, 592 (5th Cir.1999). Therefore, the plaintiffs in *Siemer* had the burden of showing Learjet could reasonably have anticipated being sued in Texas. One way of doing this would have been to show the one percent of sales to Texas residents was high, compared to that in other jurisdictions. The *Siemer* plaintiffs evidently did not or could not do so. In Texas, conversely, the *defendant* has the burden of negating all possible grounds of personal jurisdiction. *Garner,* 966 S.W.2d at 802. Therefore, it was *ATCC's* burden to show it could not reasonably have anticipated being sued in Texas. One way to have done this would have been for ATCC

to show its Texas sales were minimal or relatively low compared to its sales in other jurisdictions. Instead, the evidence showed ATCC's annual Texas sales were numerous, repetitive, and made Texas ATCC's sixth biggest U.S. sales market. And while ATCC's Texas sales were only 3.5 percent of its overall business, ATCC did not demonstrate whether this figure was high or low compared to that in the 45 countries to which it made sales.

We also distinguish *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.*, a contract-breach suit ATCC cites. 700 F.2d 1026 (5th Cir.1983). No personal jurisdiction existed there because the goods the plaintiff Texas corporation made were shipped outside Texas, where all the defendant corporation's work took place; the defendant corporation's sole Texas contact was this one contract; the Texas corporation's agent initiated the deal; and the contract incorporated Alaska law. *Id.* at 1029–31.

Finally, we distinguish two more Texas cases on which ATCC relies. In *Billingsley Parts and Equipment, Inc. v. Vose*, we held that no general jurisdiction existed because the defendant's only Texas contacts related to the one contract under litigation. 881 S.W.2d 165, 169 (Tex. App.—Houston [1st Dist.] 1994, writ denied). Here, in contrast, ATCC's sales and contracts were separate, discrete, and "repetitive." In *U–Anchor Advertising, Inc. v. Burt*, among other differences with the case at hand, the defendant was a "passive customer of a Texas corporation who neither sought, initiated, nor profited from his single and fortuitous contact with Texas." 553 S.W.2d 760, 763 (Tex.1977).

### 7. Resolution

We hold the trial judge did not err in determining ATCC purposefully established minimum contacts with Texas on a continuous and systematic basis and that Texas thus has general personal jurisdiction over ATCC.

We overrule ATCC's point of error two and the corresponding part of point of error four.

### B. Fair Play and Substantial Justice

In point of error three, ATCC argues that traditional notions of fair play and substantial justice do not permit the exercise of general personal jurisdiction over it. In point of error four, ATCC argues that assertion of personal jurisdiction violates the federal Constitution's due process guarantees. We treat these points together.

The exercise of jurisdiction over ATCC must comport with fair play and substantial justice. *Burger King Corp.*, 471 U.S. at 477, 105 S.Ct. at 2184; *Guardian Royal*, 815 S.W.2d at 231. We may consider factors such as (1) the burden on ATCC, (2) Texas's interest in adjudicating the dispute, (3) appellees' interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental, substantive social policies. *Burger King Corp.*, 471 U.S. at 477, 105 S.Ct. at 2184; *Guardian Royal*, 815 S.W.2d at 231. Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state. *Guardian Royal*, 815 S.W.2d at 231. The burden was on ATCC to present "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Id.*

### 1. The Burden on ATCC

In addition to the fact that ATCC has no physical presence in Texas, ATCC relies on its officer's affidavit that, "It would be burdensome, inconvenient, and expensive for ATCC to be forced to come to Brazoria County, Texas, to defend this suit." This statement is conclusory. ATCC's brief does not rely on any other

record evidence of, for example, how many nonresident witnesses are necessary, the extent of their hardship or ability to testify in Texas, or any one's refusal to testify here voluntarily. *See E.I. DuPont De Nemours & Co. v. Bailey,* 986 S.W.2d 82, 84 (Tex.App.—Beaumont 1999, pet. dism'd w.o.j.) (concluding defendant did not demonstrate it would be excessively burdened by defending suit in Texas when defendant did not introduce evidence of these and like matters). We note, too, that ATCC had no difficulty in doing enough business in Texas to make Texas its sixth biggest U.S. market, albeit by mail and phone, and that its high officers found it convenient to attend conferences here.

### 2. Texas's Interest in the Dispute

ATCC argues that (1) Texas's interest in this dispute is slight because only about 10 percent of appellees are Texas residents and, in any event, (2) Texas's interest in ensuring the quality and safety of ATCC's materials sold to Texans is not implicated in a case concerning shipments to Iraq. As for the first argument, Texas has an interest because 185 of its residents are involved. This is more than 10 percent of all appellees. No other state is said to be home to more. Moreover, only a small percentage of appellees would likely be the residents of *any* one state. For that reason, the trial judge could have reasonably concluded that Texas has as great an interest in this dispute as does any other state, including Maryland. The same may be said for the second argument: if it is meritorious, then *no* state would have an interest in adjudicating a dispute over materials sold to Iraq and allegedly used against U.S. military personnel there.

We distinguish *James v. Illinois Central Railroad Co.,* on which ATCC relies. 965 S.W.2d 594. There, neither the plaintiff, who sued the railroad for injuries he sustained as a switchman in his home state of Tennessee, nor the railroad were residents of Texas. *Id.* at 596, 599. Here, more than 10 percent of appellees are Texas residents. And, while we did not express-

ly base *James*'s holding that "Texas, by subjecting Illinois Central to its court system, would not be protecting its citizens from the potential future actions of Illinois Central" on this, we note that Tennessee clearly *would* have had a such an interest, because the accident there happened to one of its own residents. *Id.* at 599. Here, in contrast, *no* state's interest is shown to be greater than any other's in the alleged use of pathogens against these plaintiffs in an overseas war.

Accordingly, this factor weighs in favor of Texas jurisdiction or, at the very least, it does not favor any state over Texas.

### 3. Appellees' Interest in Convenient and Effective Relief

### 4. The Interstate Judicial System's Interest in Effective Resolution of this Controversy

ATCC claims the lengthy procedural history of this case shows appellees' interest in obtaining convenient and effective relief is not served by allowing suit here. In support, ATCC argues (1) it "has spent nearly five years trying to extricate itself from this case," (2) 20 other defendants have special appearances pending, and (3) appellees have not yet been certified as a class. None of these items makes Texas less convenient or effective for appellees: the first is due to ATCC's efforts, not appellees'; the second would be as likely to occur in any state, given that 83 defendants and 1799 plaintiffs from 49 states are involved; and the last is irrelevant. Appellees would not have selected Texas as their forum had they considered it inconvenient or ineffective for them. *See DuPont,* 986 S.W.2d at 85 (even when majority of plaintiffs were nonresidents, holding, "The plaintiffs chose Texas as their forum; therefore, we can presume they do not find it inconvenient or ineffective."); *Solow v. Century Assets Corp.,* 12 S.W.3d 512, 517 (Tex.App.—Beaumont 1999, no pet.) (same). ATCC does not argue separately how the interstate judicial system's interest in the effective reso-

lution of this controversy weighs against subjecting ATCC to suit in Texas.

Accordingly, these factors weigh in favor of Texas jurisdiction.

### 5. The Shared Interest of the Several States in Furthering Fundamental, Substantive Social Policies

ATCC argues that, as a matter of social policy, it is contrary to Texas's interest to exercise jurisdiction over it, because doing so would deter ATCC, which is a non-profit research organization, from making its services and materials available in Texas. This argument could be true for any state except Maryland, which is ATCC's principal place of business. In any event, we agree with appellees that Texas has an equal interest with that of all other states in adjudicating the claims of U.S. service personnel—including some of its own residents—allegedly exposed to dangerous pathogens in Iraq.

Accordingly, this factor weighs in favor of Texas jurisdiction or, at least, it does not favor any state over Texas. *See General Refractories Co. v. Martin*, 8 S.W.3d 818, 823–24 (Tex.App.—Beaumont 2000, pet. filed) (holding this factor weighed in favor of Texas jurisdiction when no evidence showed other states' social policy interest was greater than that of Texas); *DuPont*, 986 S.W.2d at 85 (holding this factor weighed in favor of neither state under same circumstances).

### 6. Resolution

We hold the trial judge did not err in determining the exercise of jurisdiction over ATCC would not offend traditional notions of fair play and substantial justice.

We overrule point of error three and the remainder of point of error four.

### VI. Conclusion

We affirm the order denying ATCC's special appearance.

### SUPPLEMENTAL OPINION ON MOTION FOR REHEARING

Appellant, American Type Culture Collection, Inc. ("ATCC"), has moved for rehearing. We overrule that motion, but issue this supplemental opinion to address some of its arguments.

█ Under rehearing issue one, ATCC argues that our jurisdictional formula results in jurisdiction over mail-order companies only in populous states, thereby violating the U.S. Constitution's Due Process Clause.

ATCC did not argue this before rehearing, although appellees had relied heavily on the fact that Texas was ATCC's sixth largest U.S. market and that ATCC's sales were "repetitive" and not sporadic—the same facts on which our opinion largely relied. We conclude this is not an argument that could have been made only after reading our opinion. Therefore, we will not consider it. *See, e.g., McGuire v. F.D.I.C.*, 561 S.W.2d 213, 216 (Tex.Civ. App.—Houston [1st Dist.] 1977, no writ); *Trice Prod. Co. v. Dutton Drilling Co.*, 333 S.W.2d 607, 617 (Tex.Civ.App.—Houston 1960, writ ref'd n.r.e.).

█ Moreover, adopting ATCC's view would result in virtually a per se rule preventing general personal jurisdiction over mail-order companies in any state but where they are headquartered. We can find no support for such a per se rule.[1]

---

1. Some case law finding general personal jurisdiction over non-resident mail-order companies indicates the opposite. *See Sollinger v. Nasco Int'l, Inc.*, 655 F.Supp. 1385, 1388–89 (D.Vt.1987) (under long-arm statute reaching as far as Texas's, after holding specific personal jurisdiction existed, noting in dicta that there was also general personal jurisdiction when defendant was mail- and phone-order company, sent its catalog to unspecified number of Vermont residents, and had no other Vermont contacts); *see also Dillon v. Numismatic Funding Corp.*, 291 N.C. 674, 679–80, 231 S.E.2d 629, 632–33 (1977) (under long-arm statute reaching as far as Texas's, and for claims that did not arise out of defendant's activities in North Carolina, holding personal jurisdiction existed over defendant that "engaged in substantial activity" in North Carolina by regularly mailing advertisements to

We overrule this argument under rehearing issue one.

Under rehearing issue two, ATCC argues

The Panel gives only lip service to the concept of purposeful availment, adopting what might best be described as a "pebbles-on-the-scale" theory of personal jurisdiction. It has accumulated a number of pebble-like facts (*e.g.,* ATCC's attending five conferences in Texas, making 1.7% of sales to Texas residents, etc.) that it concedes would be insufficient to justify general jurisdiction by themselves and has declared that the sum of these pebbles is, in essence, greater than their constitutive parts.

We disagree. We placed some "pebbles" on the jurisdictional scale, but only on top of the "bedrock" facts that (1) Texas was ATCC's sixth biggest U.S. market; (2) its sales were continuous and regular, not sporadic; and (3) these sales had continued for at least 18 years. That is, minimal contacts, such as ATCC's attending Texas conferences and not showing its contracts included non-Texas-choice-of-law clauses, and signing 2.7 percent of its repository agreements with Texas residents, would not have tipped the jurisdictional scale had Texas not already been an important sales market for ATCC.

We overrule this argument under rehearing issue two.

We overrule ATCC's rehearing motion.

North Carolina residents, selling $50,000 of coins to 27 residents in 142 sales, and once sending representative to sell to and service North Carolina customer); *Michigan Nat'l Bank v. Quality Dinette, Inc.,* 888 F.2d 462, 466 (6th Cir.1989) (under long-arm statute reaching as far as Texas's, holding there was general personal jurisdiction when defendants were mail-order businesses and also solicited sales by mail, they had independent sales representative in Michigan, 3 percent of total sales were in Michigan, they made at least one sale per month, and they had no other contacts with Michigan). *Cf. Tools USA & Equip. Co. v. Champ Frame Straightening Equip. Inc.,* 841 F.Supp. 719, 720–21

The panel denied appellant's motion for rehearing.

A majority of the Justices of the Court voted to deny appellant's motion for en-banc rehearing.

Justice O'CONNOR dissents from the denial of appellant's motion for en-banc rehearing.

MICHOL O'CONNOR, Justice, dissenting from denial of appellant's motion for en–banc rehearing.

By this opinion, this Court creates the concept of comparative personal jurisdiction.[1] I dissent from the denial of en banc review.

The facts upon which the panel finds personal jurisdiction are extremely weak. The full Court should review both the legal and factual issues in this case.

I agree with the appellant that the panel should not have found personal jurisdiction over the appellant based on the panel's suggestion of additional evidence the appellant *could have* introduced. There is always room to speculate about additional proof. The underlying rationale of court proceedings is that a trial creates a closed universe upon which to base a decision. We should not rule in this case based on hypothetical evidence.

Even if such evidence were available for review, I believe it would have little or no relevance. Evidence showing sales were low in other states, as compared to sales in Texas, should not be a factor to be consid-

(M.D.N.C.1993) (after applying virtually same "continuous and systematic—doing business" test as that used to determine general personal jurisdiction, holding venue proper against defendant in North Carolina district in which 1 to 1.5 percent of defendant's national mail-order business, and 2.5 to 3 percent of its *publication circulation, took place*).

1. Because the full Court has refused to hear the case en banc, the decision of the panel constitutes the decision of the whole court. *O'Connor v. First Court of Appeals,* 837 S.W.2d 94, 96 (Tex.1992).

ered in special appearance cases. Whether a defendant is involved in commerce in another state to a greater or lesser extent than in Texas should have no bearing on whether that defendant has subjected itself to the jurisdiction of Texas courts. Under the panel's rationale, almost every defendant in a special appearance case would find it necessary to present evidence of a comparative statistical analysis with other states.

I would grant en banc review.