Jeffrey **MUDGETT**, Appellant,

v.

**PAXSON MACHINE COMPANY**, Appellee.

No. 13–85–369–CV.

Court of Appeals of Texas,
Corpus Christi.

April 24, 1986.

Rehearing Denied May 29, 1986.

Mike Felber, Denbow, Wells, Williford & Felber, Fort Worth, for appellant.

Eugene W. Brees, II, John P. Polewski, Thompson & Knight, Dallas, for appellee.

Before UTTER, SEERDEN and BENAVIDES, JJ.

OPINION

UTTER, Justice.

Appellant Mudgett brought suit against Thopax Investment Corporation (the former Paxson Machine Company) (Paxson I) and Paxson Machine Company (Paxson II) as a result of personal injuries he sustained in an accident involving a metal-slitting machine.[1] Prior to the accident, Paxson I sold its assets to Paxson II, and then changed its name to Thopax Investment Corporation. Paxson II filed a motion for summary judgment asserting that it had neither designed, manufactured, nor sold the machine in question. Paxson II further asserted that it did not assume tort liability by the purchase of Paxson I's assets. The trial court granted the summary judgment and severed the claims asserted against Paxson I from those asserted against Paxson II. Appellant Mudgett appeals the granting of the summary judgment.

---

1. The slitting machine is composed of three basic components, the coiler, the slitter, and the recoiler, and is used to cut and roll large pieces of sheet metal. The three components, as a unit, are called a "slitting line."

The summary judgment evidence shows that on December 23, 1963, Paxson I and R.P.B. Corporation entered into an agreement whereby R.P.B. Corp. was to purchase substantially all of the assets of Paxson I. The agreement states that December 30, 1963, was to be the closing date of the transaction. After the sale, Paxson I changed its name to Thopax Investment Company and R.P.B. Corp. changed its name to Paxson Machine Company (Paxson II).

By purchase orders dated October 1, 1963, Metal Goods Corporation (Metal Goods), a division of Alcoa Corporation, ordered a slitting line from Paxson I. A delivery date of November 1, 1963, was requested.

On February 8, 1983, Mudgett injured his left hand while operating the slitting machine for his employer, Metal Goods. Mudgett then sued Paxson I and Paxson II under the theory of products liability.

■ By his first three points of error, appellant asserts that fact issues remain concerning whether Paxson I or Paxson II manufactured, designed, assembled, sold or delivered the slitting machine. Appellee's summary judgment evidence, a three page document which we consider to be an invoice, lists the specifications incorporated into each of the three basic components of the slitting line manufactured for Metal Goods. At the bottom of the first page is the handwritten notation, "Shipped 12/13/63 via Metal Goods Truck." Appellee further has shown, by summary judgment evidence, that the sale of the assets of Paxson I was closed on December 30, 1963. This evidence established that the slitting machine in question was manufactured, designed, assembled, sold and delivered *prior to* December 30, 1963, the date Paxson II purchased the assets of Paxson I. Since Paxson II (the movant) established these facts, the burden shifted to appellant (the non-movant) to set forth sufficient summary judgment evidence to give rise to a genuine issue of material fact. *First Federal Savings & Loan Ass'n v.*

*Ritenour*, 704 S.W.2d 895 (Tex.App.—Corpus Christi, 1986, writ ref'd n.r.e.).

Appellant contends that:

the notation only indicates that the uncoiler machine of the slitting line [the component described on the first page] was shipped that date. On the invoice for the slitting component, there is no indication of a date of shipment.

This argument is unfounded because the document was obviously intended to be a three page invoice as evidenced by the notations on the top of the invoices "page two of three" and "page three of three." Except for the above stated argument, appellant has not brought forth any summary judgment evidence which would show that a genuine issue of material fact exists as to the truthfulness or accuracy of these notations as to the date these articles were shipped. Points of error one, two and three are overruled.

By points of error four and five, appellant contends that a fact issue exists as to whether Paxson II assumed tort liability over the slitter in question as a result of the assets purchase. Appellant points out that the sales agreement provides that it shall be "construed and enforced by the laws of Ohio."

Appellant contends that Ohio law "recognizes that a successor [corporation] can expressly or impliedly assume the tort liability of its predecessor," citing *Travis v. Harris Corp.*, 565 F.2d 443 (7th Cir.1977) and *Chadwick v. Air Reduction Co.*, 239 F.Supp. 247 (N.D.Ohio 1965). Appellant first urges us to find that Paxson II *expressly* assumed *"all* liabilities, including tort liability," or secondly, to find "at least an implied agreement to assume liability including tort liability."

The laws of Texas and Ohio are in accord regarding the interpretation of written contracts. The entire agreement must be considered in order to ascertain the true intent of the parties and no single provision is to be given controlling effect. *Compare Coker v. Coker*, 650 S.W.2d 391 (Tex.1983); *Corriveau v. 3005 Investment Corp.*, 697 S.W.2d 766 (Tex.App.—Corpus Christi

1985, writ ref'd n.r.e.) *with Inland Refuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.,* 474 N.E.2d 271 (Ohio 1984). If the written agreement is worded so that it can be given a definite legal meaning or interpretation, then it is not ambiguous and the court will construe it as a matter of law. *Coker v. Coker,* 650 S.W.2d at 393; *Corriveau v. 3005 Investment Corp.,* 697 S.W.2d at 767; *Inland Refuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.,* 474 N.E.2d at 272.

The sales agreement provides,[2] in pertinent parts, as follows:

> The said assets and business shall be sold free and clear of all liabilities, obligations ... of any description, except only those liabilities and obligations which the Buyer shall assume.
>
> *       *       *       *       *       *
>
> ... the Buyer expressly assumes and guarantees ... all debts and liabilities of the Seller set forth in the November 30th Balance Sheet and all liabilities and obligations under normal contracts, orders and commitments incurred in the regular course of business to the closing date and specifically assumes Seller's liabilities for 1963 Federal Income tax ...
>
> *       *       *       *       *       *
>
> Except to the extent reflected or reserved against in the November 30th Balance Sheet, the Seller as of such date had no liabilities or obligations of any nature, whether accrued, absolute, contingent or otherwise, including without limitation, those liabilities due or to become due, except for Federal Income taxes for the year 1963.
>
> *       *       *       *       *       *

A separate document, executed on the closing date (December 30, 1963) and entitled "Assumption of Liabilities," provides for assumption of:

> a) All liabilities and obligations of Paxson Machine Company *in respect of the contracts and commitments* entered into in the ordinary course of business *as disclosed by the balance sheet* of Paxson Machine Company as of November 30, 1963, and *such further liabilities and obligations* of Paxson Machine Company only as have been incurred in the ordinary course of business from November 30, 1963 to December 30, 1963, all of which liabilities and obligations are set forth on Exhibit A which is attached hereto and expressly made a part hereof.
> b) All liabilities for Federal Income taxes for the year 1963 and thereafter. [emphasis ours]

The November 30th Balance Sheet lists liabilities as "[n]otes and accounts payable," "[a]ccrued liabilities," "[a]dvances on contracts," "[d]ividends payable" and, "[r]eserve for Federal taxes on income."

█ Notwithstanding the presumption discussed in footnote 2, the agreement of the parties regarding the assumption of liabilities is unambiguous. Clearly the parties intended that Paxson II was only to assume those debts, liabilities or obligations as disclosed in the November 30th Balance Sheet, and those "liabilities and obligations under normal contracts, orders and commitments incurred in the regular course of business" between November 30th and December 30th which are not and could not have been reflected in the November 30th Balance Sheet. Appellant argues that the assumption of liabilities "incurred in the ordinary course of business" is evidence of an assumption of tort liability. We disagree. The phrase "incurred in the ordinary course of business," and similar phrases, are modified by phrases such as "as disclosed by the balance sheet." This indicates that such liabilities and obligations are only of the type listed in the balance sheet. When a matter is specifical-

---

**2.** Initially, we note that many portions of the sales agreement are illegible, and it can be presumed that the illegible portions not only support, but *establish* the correctness of the judgment. *See, e.g., Cliff Management Corp. v. Lovell,* 695 S.W.2d 301 (Tex.App.—Waco 1985, no writ); *Winters v. Highlands Underwriters Insurance Co.,* 693 S.W.2d 729 (Tex.App.—Houston [14th Dist.] 1985, no writ); *Castillo v. Sears, Roebuck & Co.,* 663 S.W.2d 60 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.).

ly addressed by the written terms of a contract no terms will be implied concerning the matter. *City of Cincinnati v. Cincinnati Reds*, 483 N.E.2d 1181 (Ohio App. 1984). Points of error four and five are overruled.

By points of error six and seven, appellant contends that a fact issue exists as to whether the assets purchase constituted a "de facto merger or [a] continuation under the doctrine of successor liability." The only application of the de facto merger doctrine by a Texas court occurred in *Western Resources Life Insurance Co. v. Gerhardt*, 553 S.W.2d 783 (Tex.Civ.App.—Austin 1977, writ ref'd n.r.e.). The doctrine was recently considered and rejected in *Suarez v. Sherman Gin Co.*, 697 S.W.2d 17 (Tex.App.—Dallas 1985, writ ref'd n.r.e.).[3] In 1979, the Texas Legislature amended TEX.BUS.CORP.ACT ANN. art. 5.10 (Vernon 1980), "the purpose of which [was] to *preclude* the application of de facto merger in any sale, lease, exchange or other disposition of all or substantially all the property and assets of a corporation...." TEX.BUS.CORP.ACT ANN. art. 5.10 comment. [emphasis ours] The amendment added section B:

> B. A disposition of all, or substantially all, of the property and assets of a corporation requiring the special authorization of the shareholders of the corporation under Section A of this article:
>
> (1) is not considered to be a merger or consolidation pursuant to this Act or otherwise; and
>
> (2) Except as otherwise expressly provided by another statute, *does not make the acquiring corporation responsible or liable for any liability or obligation of the selling corporation that the acquiring corporation did not expressly assume.* [emphasis ours]

The comment to art. 5.10 further expressly abrogated the decision in *Gerhardt* concerning its application of the de facto merger doctrine. We agree with the *Suarez* Court where it states, "the legislature's prompt action to override *Gerhardt* and statutorily preclude application of the de facto merger doctrine in Texas clearly states a public policy opposed to the doctrine." *Suarez v. Sherman Gin Co.*, 697 S.W.2d at 20.

■ Appellant also contends that "the transaction was a mere continuation of the predecessor corporation," citing *Cyr v. B. Offen & Co.*, 501 F.2d 1145 (1st Cir.1974). The "mere continuation" doctrine[4] is an even more liberal means of imposing liability upon the acquiring corporation in a purchase of assets transaction than is the de facto merger doctrine. *Compare Shannon v. Samuel Langston Co.*, 379 F.Supp. 797 (W.D.Mich.1974) (de facto merger factors) *with Cyr v. B. Offen & Co.*, 501 F.2d 1145 (1st Cir.1974) (mere continuation factors). Certainly if the de facto merger doctrine is contrary to the public policy of our state, so must be the mere continuation doctrine. In any event, we decline to impose liability upon an acquiring corporation under either theory in the face of clear legislative intent to the contrary. Points of error six and seven are overruled.

■ By his eighth and final point of error, appellant urges us to adopt the "product line" theory of successor liability. Under this theory, a successor that continues the output of a line of products assumes strict liability for defective units of the same product line *previously* manufactured and sold by its predecessor. *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 431 A.2d 811 (1981); *Ray v. Alad Corp.*, 19 Cal.3d 22, 136 Cal.Rptr. 534, 560 P.2d 3 (1977). Whether Texas should adopt the product line theory was recently con-

---

**3.** For a list of the factors indicative of a de facto merger, see *Suarez v. Sherman Gin Co.*, 697 S.W.2d at 20.

**4.** This doctrine would impose liability upon a successor corporation, regardless of the manner in which the assets were acquired, if the buyer purchased the "good will" and name of the seller, operated the business in the same place, with the same employees and continued to produce the same product. *See Cyr v. B. Offen & Co.*, 501 F.2d at 1153.

sidered in *Griggs v. Capitol Machine Works, Inc.*, 690 S.W.2d 287 (Tex.App.—Austin 1985) (writ ref'd n.r.e. *per curiam*,) 701 S.W.2d 238 (Tex.1986). The *Griggs* Court thoroughly discussed the rationale of the product line theory, comparing it with the basis for products liability in Texas, the Restatement (Second) of Torts § 402 A (1965). The Court determined that the product line theory is incompatible with "the theory of products-liability tort actions, for *that* theory and cause of action, and the underlying 'social policies,' expressly *disclaim* imposing a duty upon one who has no ability to control the circumstances and events which preceded a specific plaintiff's injury." [emphasis in original] *Griggs v. Capitol Machine Works, Inc.*, 690 S.W.2d at 292. In short, the successor cannot be said to have created the risk associated with a product manufactured by its predecessor. The decision to make such a far-reaching change in the law is not ours, but uniquely within the province of the legislature. Points of error number eight is overruled.

The judgment of the trial court is AFFIRMED.