Ian SHAPOLSKY, Anita Shapolsky,
and Sure Seller, Inc.,
Appellants,

v.

Pete BREWTON, Appellee.

No. 14–00–00714–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

June 28, 2001.

Rehearing Overruled Sept. 20, 2001.

Daniel Ward Jackson, Houston, Scott Rothenberg, Bellaire, for appellants.

R. Christopher Bell, John Eric Carlson, Houston, for appellee.

Panel consists of Justices YATES, WITTIG, and FROST.

## OPINION

FROST, Justice.

This is an interlocutory, accelerated appeal from the trial court's denial of special appearances filed by appellants, Ian Shapolsky, Anita Shapolsky, and Sure Seller, Inc.

## I. Factual and Procedural Background

Appellee, Pete Brewton, is an investigative journalist. At the behest of national book publisher Simon & Schuster, he authored a political exposé entitled *The Mafia, the CIA and George Bush.* Brewton wanted the book published soon after its completion in July 1992, to coincide with the November 1992 presidential election. However, Simon & Schuster was unable to publish the book in 1992. Several other publishers approached Brewton to publish his book. Among them was Shapolsky Publishers, Inc. ("SPI"), a New York based specialty book publisher. When SPI confirmed that it could publish the book well before the 1992 election, Brewton began negotiations with its president, sole shareholder, and director, Ian Shapolsky.

### A. Brewton's Publishing Contract with SPI

Brewton, who was then living in Austin, Texas, engaged in contract negotiations by telephone, fax, and mail with SPI (through Ian Shapolsky) in New York. Through these communications, Ian represented to Brewton that SPI had the resources to publish and market the book nationally. The parties' negotiations culminated in a publishing contract, which provided that SPI would use its best efforts to print, publish, and sell the book before election day. The only parties to this agreement were SPI and Brewton.

After the parties had executed the publishing contract, Ian notified Brewton that SPI did not have the resources to print the book and that the printer would not extend credit for its publication. Without time to find another publisher who could meet the target publication date, Brewton agreed to make a short-term loan to SPI by advancing $44,500, half the cost to print and ship the book. From Texas, Brewton sent a cashier's check for $39,500 directly to the printer in Virginia, and sent a separate check for $5,000 to SPI for shipping costs. To document this loan, the parties entered into a second contract, entitled "Agreement between Mr. Peter Brewton & SPI Books–Shapolsky Publishers, Inc.," in which (1) SPI promised to repay the $44,500 within thirty days at a 12% per year interest rate and (2) the parties agreed to adjust the agreed royalty rates 10–15% upward in favor of Brewton.

By the first week of October 1992, nearly 31,000 copies of the book had been printed, but few were actually available for sale in bookstores by election day. SPI spent less than $15,000 to promote and advertise Brewton's book, $5,500 of which Brewton advanced to pay for television and radio publicity.

In December 1992, when the $44,500 loan repayment was already past due, SPI sent Brewton, in Texas, four post-dated checks totaling $30,000, in partial payment for Brewton's advance. Of this $30,000, a check for $10,000, drawn on a New York bank, failed to clear. SPI did not reimburse Brewton for the $5,500 publicity advance or for $9,000 (excluding interest) in advances he made for printing and shipping.

Under the publishing contract, SPI was obligated to send Brewton, on or about July 31, 1993, a royalty check and a statement disclosing the number of books sold. Brewton received neither. A few days later, SPI filed for Chapter 11 bankruptcy protection in New York.

### B. Formation of Sure Seller, Inc.

Within six weeks after SPI filed for bankruptcy, Ian's sister, Lisa Cohen, formed a new publishing company, Sure Seller, Inc. ("SSI"), which was incorporated in Florida. At some point, Haim Zit-

man purchased 100% of SSI's authorized shares.[1]

SSI's original formation documents list Cohen as the sole officer, director, subscriber, and registered agent. Anita Shapolsky, Ian's mother, served as SSI's secretary. Eventually, she became SSI's sole officer and director. SSI had the same address, telephone and fax number as Anita's art gallery in New York.

### C. Termination of Publishing Contract

By stipulation, signed by the New York bankruptcy court, the official unsecured creditors committee, Brewton, and SPI, the publishing contract was terminated in October 1994. The hardcover rights to *The Mafia, the CIA, and George Bush* were to remain with SPI, who was expressly granted the right "to sell off any remaining inventory without any liability to account to Brewton under the contract or otherwise." The stipulation further provided that "Brewton is only entitled to royalties for books sold as of the date of this stipulation [October 18, 1994] and not after this date."

### D. SSI's Acquisition of SPI Assets

In December 1994, Zitman and Anita entered into an asset acquisition agreement in which Anita agreed to loan about $110,000 to SSI to purchase, by highest bid from the bankruptcy trustee, assets from the SPI bankruptcy estate. Under this agreement, Anita was to recoup her advance for the purchase of the SPI assets and her legal expenses, plus 20%. Ian was to earn a salary for work he performed in liquidating the assets SSI purchased from the SPI bankruptcy estate. Any assets purchased from the bankruptcy estate that remained after the liquidation were to be divided, 90% to Anita and 10% to Zitman. In accordance with the agreement, SSI submitted a bid for assets of the SPI bankruptcy estate. In a court approved transaction, SSI purchased SPI's book inventory from SPI's bankruptcy estate. The New York bankruptcy court entered an "Order Approving Sale of Assets, Free and Clear of all Claims, Liens and Encumbrances."

### E. Sale of Brewton's Book in Texas

In January 1996, SSI filled an order for three copies of Brewton's book for a Brenham, Texas bookstore. Enclosed with that order was a catalog from SSI offering a variety of books for sale, including *The Mafia, the CIA, and George Bush.* On May 2, 1999, five copies of Brewton's book were purchased from a Barnes & Noble bookstore in Austin, Texas. It is unclear from the record how or through whom Barnes & Noble acquired these books.

### F. Brewton's Claims in the Underlying Litigation

Brewton sued Ian, Anita, and SSI in the Harris County District Court. The suit included claims for breach of contract, fraud, and violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act. *See* 18 U.S.C.A. § 1961, *et seq.* SPI was not made a party to the litigation. All three named defendants filed special appearances challenging the court's exercise of personal jurisdiction over them. The trial court sustained jurisdiction over all three, and they now appeal the denial of their special appearances. We affirm in part and reverse and remand in part.

### II. Issues Presented for Review

In seven points of error, appellants complain that the trial court erred in overrul-

---

**1.** Zitman later sold 85% of his SSI stock to Joseph Benjamin Investment Corporation.

ing their special appearances because each lacks the necessary contacts with Texas to establish either specific or general jurisdiction. In the first point of error, appellants assert that the trial court's order overruling Ian's special appearance, on the grounds that he (1) committed torts, in part, in Texas and (2) entered into a contract with Brewton, a Texas resident, to be partially performable in Texas, is incorrect as a matter of law and not supported by factually sufficient evidence.

In their second and third points of error, appellants complain that the trial court's order overruling SSI's special appearance, on the grounds that (1) SSI sold copies of Brewton's book in Texas and that (2) SSI is a successor-in-interest to SPI, is incorrect as a matter of law and not supported by factually sufficient evidence.

In their fourth through sixth points of error, appellants complain that the trial court's order overruling Anita's jurisdictional challenge on the grounds that (1) Anita waived her special appearance is incorrect as a matter of law and that (2) any finding that Anita is the alter ego of SPI and SSI is not supported by factually sufficient evidence.

Finally, in their seventh point of error, appellants assert that the trial court's order overruling their special appearances is not based on factually sufficient evidence because none of them have the minimum contacts with Texas necessary to establish personal jurisdiction, either general or specific. This point will be discussed in the context of analyzing each appellant's contacts with this forum.

### III. STANDARD OF REVIEW

■ Whether a Texas court may assert personal jurisdiction over a nonresident defendant is a question of law subject to a *de novo* review. *C–Loc Retention Sys., Inc. v. Hendrix*, 993 S.W.2d 473, 476 (Tex.App.—Houston [14th Dist.] 1999, no pet.). On appeal from a special appearance, we review the record[2] to determine if the nonresident defendant satisfied its burden to negate all possible grounds for personal jurisdiction. *Abacan Technical Servs. Ltd. v. Global Marine Int'l Servs. Corp.*, 994 S.W.2d 839, 843 (Tex.App.—Houston [1st Dist.] 1999, no pet.) (citing *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex.1985)). Often, the trial court's determination of personal jurisdiction involves a resolution of underlying factual disputes. *C–Loc*, 993 S.W.2d at 476 (citing *Conner v. ContiCarriers & Terminals, Inc.*, 944 S.W.2d 405, 411 (Tex. App.—Houston [14th Dist.] 1997, no writ)). An appellate court reviews the propriety of that resolution for factual sufficiency by examining all the evidence in the record. *Id.* (citing *Conner*, 944 S.W.2d at 411). The reviewing court will reverse the trial court's decision for factual insufficiency only where that decision is "so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust." *Cartlidge v. Hernandez*, 9 S.W.3d 341, 346 (Tex.App.—Houston [14th Dist.] 1999, no pet.) (citing *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951); *Runnells v. Firestone*, 746 S.W.2d 845, 849 (Tex.App.—Houston [14th Dist.] 1988), *writ denied*, 760 S.W.2d 240 (Tex. 1988) (per curiam)).

■ When the trial court denies a special appearance, the defendant may request findings of fact. Tex.R. Civ. P. 296;

---

**2.** The trial court determines the special appearance "on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." TEX.R. CIV. P. 120a(3).

Tex.R.App. P. 28.1. Where, as here, the trial court does not file findings, we view the trial court's judgment as impliedly finding all the facts necessary to support its judgment. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex.1990). Where a complete statement of facts appears in the record, however, these implied findings are not conclusive and an appellant may challenge the sufficiency of the evidence. *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex.1989).[3] Thus, in this case, we review the trial court's application of law *de novo* and review the facts for sufficiency. *See M.G.M. Grand Hotel, Inc. v. Castro*, 8 S.W.3d 403, 408 (Tex.App.—Corpus Christi 1999, no pet.).

### IV. PERSONAL JURISDICTION

■ None of the appellants/defendants are residents of Texas. Texas courts may assert jurisdiction over a nonresident defendant only (1) where the Texas long-arm statute authorizes such exercise of jurisdiction and (2) where such exercise is consistent with the due process guarantees embodied in both the United States and Texas Constitutions. *Cartlidge v. Hernandez*, 9 S.W.3d 341, 346 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (citing *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex.1996) (orig.proceeding); TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997)). Whether a Texas court may exercise personal jurisdiction over a nonresident defendant presents a question of law. *James v. Ill. Cent. R.R. Co.*, 965 S.W.2d 594, 596 (Tex.App.—Houston [1st Dist.] 1998, no pet.).

The Texas long-arm statute authorizes jurisdiction over a nonresident defendant "doing business" in Texas. § 17.042;

*Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex.1991) (citing *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). The Texas Civil Practice and Remedies Code characterizes nonresident activity as "doing business" in Texas where the nonresident:

(1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;

(2) commits a tort in whole or in part in this state;

(3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state; or

(4) performs any other acts that may constitute doing business. § 17.042.

■ The long-arm statute's "doing business" requirement is broad, limited only by the requirements of federal due process guarantees. *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex.1990) (citing *U–Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex.1977)); *Daimler–Benz Aktiengesellschaft v. Olson*, 21 S.W.3d 707, 714 (Tex.App.—Austin 2000, pet. dism'd w.o.j.). Therefore, where the exercise of personal jurisdiction comports with federal due process limitations, requirements of the Texas long-arm statute are satisfied. *Guardian*, 815 S.W.2d at 226 (citing *Helicopteros*, 466 U.S. at 413–14, 104 S.Ct. 1868).

■ The federal due process clause protects, among other things, a person's liberty interest in not being subject to the binding judgments of a forum with which

---

3. *See Hotel Partners v. Craig*, 993 S.W.2d 116, 122 (Tex.App.—Dallas 1994, writ denied) ("The record before us contains no statement of facts from the hearing on the competing motions. Consequently, we assume the trial court made all necessary findings to support its ruling.").

the nonresident has established no meaningful contacts, ties, or relations. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471–72, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (citing *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). With respect to personal jurisdiction, federal due process mandates (1) that the nonresident have purposefully established "minimum contacts" with the forum state; and (2) that the exercise of jurisdiction over the nonresident comport with "traditional notions of fair play and substantial justice." *CSR Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex.1996) (orig.proceeding) (quoting *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940))).

■ A nonresident establishes minimum contacts in Texas by purposefully availing itself of the privileges and benefits inherent in conducting business within the state. *CSR,* 925 S.W.2d at 594. In other words, the nonresident must purposefully invoke the benefits and protections afforded by the forum state's laws. *Reyes v. Marine Drilling Cos., Inc.,* 944 S.W.2d 401, 404 (Tex.App.—Houston [14th Dist.] 1997, no writ) (citing *Burger King,* 471 U.S. at 474–75, 105 S.Ct. 2174; *Guardian,* 815 S.W.2d at 226). Requiring purposeful availment ensures that the nonresident's connections derive from its own purposeful conduct, and not the unilateral actions of the plaintiff or third parties. *Guardian,* 815 S.W.2d at 227–28 (citing *Helicopteros,* 466 U.S. at 417, 104 S.Ct. 1868; *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 298, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). Personal jurisdiction, therefore, does not emerge from the nonresident's random, fortuitous, or attenuated contacts with the forum, or from another's acts. *Id.* at 226 (citing *Burger King,* 471 U.S. at 465, 105 S.Ct. 2174; *Helicopteros,*

466 U.S. at 417, 104 S.Ct. 1868; *World–Wide,* 444 U.S. at 298, 100 S.Ct. 559). Rather, the nonresident, itself, must take some action or engage in some conduct creating its own "substantial connection" with the forum state. *Id.* (citing *Burger King,* 471 U.S. at 474–75, 105 S.Ct. 2174).

■ Although not a separate component, foreseeability is an important consideration in determining whether a nonresident's ties to a forum create a "substantial connection." *C–Loc Retention Sys., Inc. v. Hendrix,* 993 S.W.2d 473, 477–78 (Tex. App.—Houston [14th Dist.] 1999, no pet.). The nonresident must reasonably anticipate being haled into a Texas court to answer for its injurious actions. *Cartlidge v. Hernandez,* 9 S.W.3d 341, 348 (Tex. App.—Houston [14th Dist.] 1999, no pet.).

■ If we conclude that minimum contacts with the forum state exist, we then evaluate those contacts in light of five factors to determine if the assertion of jurisdiction comports with traditional notions of fair play and substantial justice. *Antonio v. Marino,* 910 S.W.2d 624, 627 (Tex.App.—Houston [14th Dist.] 1995, no writ) (citing *Guardian,* 815 S.W.2d at 228). Those five factors are (1) the nonresident's burden; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining an efficient resolution of disputes; and (5) the states' common interest in furthering fundamental, substantive social policies. *Id.*

## A. General Jurisdiction

■ A defendant's minimum contacts with the forum state can produce either general or specific jurisdiction. *CSR Ltd. v. Link,* 925 S.W.2d 591, 595 (Tex.1996) (orig.proceeding). General jurisdiction arises when a nonresident defendant's contacts are "continuous and

systematic." *Id.* Therefore, general jurisdiction allows the forum state to exercise personal jurisdiction over the nonresident defendant, even if the cause of action did not arise from or relate to the nonresident's contacts with the state. *Id.* The general jurisdiction analysis is more demanding than the specific jurisdiction analysis as it requires a showing of substantial activity in the forum state. *Id.*

■ The only evidence in the record regarding the extent, duration, or frequency of appellants' business dealings in Texas indicates their contacts were isolated. Nothing in the record supports the notion that any of the appellants engaged in any activity in this state that would rise to the level of "continuous and systematic" contacts. None of the appellants has any employees, officers, or agents in Texas or maintains any office, residence, or place of business in this state. None leases or owns real or personal property in Texas or maintains bank accounts, telephone numbers, or mailing addresses here. *See M.G.M. Grand Hotel, Inc. v. Castro*, 8 S.W.3d 403, 412 (Tex.App.—Corpus Christi 1999, no pet.) (finding no continuous and systematic contacts for exercise of general jurisdiction where (1) there was no evidence of the "extent, duration, or frequency of company's business dealings in Texas" and where (2) the company's officer never testified company had ever filed articles of incorporation in Texas; had agent here for service of process; owned, leased, or maintained real or personal property in Texas; paid income or property taxes in Texas; or maintained an office, residence, or place of business in Texas).

Neither Ian nor Anita has any real ties to Texas. Although each of them traveled through Texas as tourists many years ago, neither has engaged in any continuous or systematic activities that would have any reasonably foreseeable consequences in Texas.

SSI is a Florida corporation with its principal place of business in New York. Ian testified, without objection, that SSI, although a book distributor, did not distribute books in Texas, and never advertised in Texas, directed any commercial business toward Texas, or contracted with any Texas resident. However, the record shows that SSI filled a single order for a small number of books and sent them to Texas.

In January 1996, SSI received and filled an unsolicited order for three copies of Brewton's book from a bookstore in Brenham, Texas. The bookstore owner, Lance Kuecker, signed an affidavit stating that when a customer requested a copy of Brewton's book, he called SSI in New York and placed the order. The book arrived C.O.D. at his bookstore via United Parcel Service. The package included an invoice for Brewton's and others' books and a catalog entitled "Sure Seller Books Holiday Catalogue 1996." The catalog listed a large number of books, including Brewton's book. According to Ian, SSI's sale to the Brenham bookstore was a "one time sale" in Texas, and SSI has never sold any other books in this state or purposely directed any commercial business toward Texas. However, the record contains evidence of other sales of Brewton's book in Texas.

The special appearance evidence includes an affidavit signed by John F. Harrison, who states that in May 1999, he purchased five copies of Brewton's book at a Barnes & Noble bookstore in Austin, Texas. Each copy had a circled "S" on the outside bottom of the book, which is the logo for SSI. The record, however, does not reveal how or through whom Barnes & Noble acquired the books. Presence of the SSI logo, while indicating that the

books originated from SSI, does not establish that *SSI sold* these books directly in Texas or that SSI had any indication these books would ultimately be sold in Texas. Moreover, Harrison's affidavit testimony cannot be read, as Brewton suggests, to establish (1) that SSI sold the five copies of Brewton's book to the Barnes & Noble in Austin, much less (2) that SSI regularly sells books in Texas. We further note that this contact occurred *after* suit was filed and, therefore, is of questionable relevance in the jurisdictional analysis. *See Am. Type Culture Collection, Inc. v. Coleman,* 26 S.W.3d 37, 43 (Tex.App.—Houston [1st Dist.] 2000, no pet.) (observing that "[f]ederal authority indicates that contacts occurring after suit is filed are irrelevant...."); *Scott v. Huey L. Cheramie, Inc.,* 833 S.W.2d 240, 242 (Tex.App.—Houston [14th Dist.] 1992, no writ) (implying that the relevant contacts are those up to the time of the injury). That leaves only the customer-driven sale at the bookstore in Brenham, delivered with an SSI advertisement. This one sale falls short of establishing a substantial connection between SSI and Texas and certainly does not qualify as the "continuous and systematic" activity necessary for a finding of minimum contacts from action or conduct SSI purposefully directed toward Texas.

In sum, the record does not demonstrate any continuous and systematic contacts by any of the appellants in Texas sufficient to support a finding of general jurisdiction. We now consider whether the trial court's denial of appellants' special appearances is supported by specific jurisdiction.

## B. Specific Jurisdiction

■ Specific jurisdiction emerges where the alleged liability "arises from or is related to" the nonresident's activity or contacts within the forum state. *CSR, Ltd. v. Link,* 925 S.W.2d 591, 595 (Tex.

1996) (orig.proceeding). A single contact with Texas, of substantial quality and nature, may be sufficient to establish specific jurisdiction when the cause of action arises from that contact. *Mem'l Hosp. Sys. v. Fisher Ins. Agency, Inc.,* 835 S.W.2d 645, 650 (Tex.App.—Houston [14th Dist.] 1992, no writ). In conducting a specific jurisdiction analysis, we focus on the relationship among the defendant, the State of Texas, and the litigation. *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990) (citing *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). Where, as here, there are multiple defendants, we must test each defendant's actions and contacts with the forum separately. *Gen. Elec. Co. v. Brown & Ross Int'l Distribs., Inc.,* 804 S.W.2d 527, 532 (Tex.App.—Houston [1st Dist.] 1990, writ denied) (citing *Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)).

### 1. Ian Shapolsky

■ Brewton's petition alleges: (1) Ian made intentional misrepresentations to Brewton, who was then in Austin, by phone, fax, and mail to induce him to sign a publishing contract with SPI; (2) Brewton relied on those false representations to his detriment, ceasing his business relationship with publisher Simon & Schuster; (3) such misrepresentations include (a) that SPI had the resources to print the book before the 1992 election; (b) SPI would market the book nationally; (c) the royalty rate payable to Brewton would be 10–15%; (4) Ian committed mail fraud, a predicate to civil racketeering, by causing SSI to mail copies of the book to Texas, for sale in Texas, without paying royalties to Brewton for the sales; and that (5) as a representative of SPI, Ian contracted with Brewton, and such contract was to be partially performed in Texas.

■ Because Brewton pled sufficient allegations [4] to bring Ian within reach of the Texas long-arm statute, we review the record to determine whether Ian has negated all bases of personal jurisdiction.[5] *See M.G.M. Grand Hotel, Inc. v. Castro*, 8 S.W.3d 403, 408 n. 2 (Tex.App.—Corpus Christi 1999, no pet.); *see Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 772 (Tex.1995) (orig.proceeding). For the reasons explained below, we find Ian failed to establish that he is not subject to the specific jurisdiction of Texas courts for torts allegedly committed in Texas.

■ Ian has acknowledged that he negotiated the publishing contract and communicated with Brewton by phone and by mail in Texas. Moreover, Ian does not deny having made the statements Brewton alleges were false during these communications. The thrust of Ian's argument is that because he did these acts only in his capacity as an SPI officer, employee or agent, the "fiduciary shield doctrine" protects him from personal jurisdiction in Texas.[6] Ian misconstrues the nature of Brewton's suit. Ian is being sued, in part, for his own misrepresentations.

■ It is the general rule in Texas that corporate agents are individually liable for fraudulent or tortious acts committed while in the service of their corporation. *Hyman Farm Serv., Inc. v. Earth Oil & Gas Co., Inc.*, 920 S.W.2d 452, 455 (Tex.App.—Amarillo 1996, no writ) ("Under longstanding Texas law, corporate agents can be held individually liable for fraudulent or tortious acts committed while working for a corporation.") (citing *Light v. Wilson*, 663 S.W.2d 813, 815 (Tex. 1983); *Holberg v. Teal Constr. Co.*, 879 S.W.2d 358, 360 (Tex.App.—Houston [14th Dist.] 1994, no writ)). Further, an officer of a corporation is always primarily liable for his own torts, even though the principal is also liable for those actions. *State v. Mink*, 990 S.W.2d 779, 783 (Tex.App.—Austin 1999, pet. denied) (citing with approval cases holding a corporate officer liable *for torts committed by the corporation through him*). However, the fact that Ian is alleged to have committed a tort in Texas is not dispositive because that, alone, does not give Texas courts jurisdiction over a nonresident. *Hoppenfeld v. Crook*, 498 S.W.2d 52 (Tex.Civ.App.—Austin 1973, writ ref'd n.r.e.). Rather, there must be a substantial connection between the contact and the cause of action in the forum state. *See id.*

4. Ian argues that (1) Brewton "failed to assign a single potential tort claim against Ian in his special appearance briefing and special appearance evidence" and (2) Ian gave "compelling, thorough, and unobjected to testimony as to lack of tortious conduct." Our review of the record reveals that Brewton's live pleading alleges tort claims against Ian.

5. "Without jurisdictional allegations by the plaintiff that the defendant has committed any act in Texas, the defendant can meet its burden of negating all potential bases of jurisdiction by presenting evidence that it is a nonresident." *Hotel Partners v. KPMG Peat Marwick*, 847 S.W.2d 630, 634 (Tex.App.—Dallas 1993, writ denied) (citing *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 438 (Tex.1982)).

6. The fiduciary shield doctrine provides that corporate officers are not subject to jurisdiction in a foreign forum if their actions are taken in a representative capacity. *Brown v. Gen. Brick Sales Co., Inc.*, 39 S.W.3d 291, 297–98 (Tex.App.—Fort Worth 2001, no pet.) (citing *Amoco Chem. Co. v. Tex. Tin Corp.*, 925 F.Supp: 1192, 1201 (S.D.Tex.1996)). In the cases applying the doctrine, the courts limited its application to jurisdictional claims based on the theory of general jurisdiction as opposed to specific jurisdiction. *Id.* at 300. Moreover, the fiduciary shield doctrine has not been explicitly adopted by the Texas Supreme Court. *Id.*

In determining whether there is a substantial connection between the nonresident defendant and the State of Texas, we must consider "foreseeability." *Guardian Royal Exch. v. English China,* 815 S.W.2d 223, 227 (Tex.1991). Where a defendant sends false information into a state, knowing it will be relied upon by a resident of the forum state, there is a foreseeable consequence of direct economic injury to the resident at its domicile. *Mem'l Hosp. Sys. v. Fisher Ins. Agency, Inc.,* 835 S.W.2d 645, 650 (Tex.App.—Houston [14th Dist.] 1992, no writ) (citing *Brown v. Flowers Indus., Inc.,* 688 F.2d 328 (5th Cir.1982)). Therefore, if the alleged tortfeasor knows that the brunt of the injury will be felt by a particular resident in the forum, it must reasonably anticipate being haled into court there to answer for its actions. *Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

In negotiating with Brewton, Ian is alleged to have made material misrepresentations, oral and written, on which Brewton relied. When Ian made the allegedly false statements to Brewton, via telephone and written communications, he knew Brewton was in Texas, and it was foreseeable that Brewton would rely upon the information he provided. *See Mem'l Hosp.,* 835 S.W.2d at 650. Brewton claims that in reliance on the information, he elected to forego potential publishing opportunities with other publishers to sign a publishing agreement with SPI. Furthermore, by sending allegedly false information into Texas, causing economic injury in Texas, Ian purposefully availed himself of the benefits and protections of Texas law. *See id.* at 651; *see also Flowers,* 688 F.2d at 330 (finding a single defamatory telephone call from out-of-state, analyzed as tortious conduct outside the state causing injury in the state, sufficient for due process purposes). The injurious effect in Texas of the torts Ian allegedly committed could have been foreseen.

Similarly, there is a strong nexus in this case between the torts Ian is alleged to have committed in Texas and the contacts with Texas, *i.e.,* it is these specific contacts which give rise to the claims Brewton asserts against Ian. Thus, we find Ian's alleged actions constitute sufficient purposeful minimum contacts with Texas to satisfy due process. *See Portland Sav. & Loan Ass'n v. Bernstein,* 716 S.W.2d 532 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.) (finding a nexus between phone calls and allegations of misrepresentation); *Rowland & Rowland, P.C. v. Tex. Employers Indem. Co.,* 973 S.W.2d 432, 435–36 (Tex.App.—Austin 1998, no pet.) (finding a significant contact in nonresident's letter to Texas resident which contained misrepresentations at issue in that case). Accordingly, we must now determine whether the assertion of jurisdiction in this case would offend traditional notions of fair play and substantial justice. *Schlobohm v. Schapiro,* 784 S.W.2d 355, 359 (Tex.1990).

Once a court determines that the nonresident defendant has purposefully established minimum contacts with the forum state, only in rare cases will the exercise of jurisdiction not comport with fair play and substantial justice. *Guardian Royal Exch. v. English China,* 815 S.W.2d 223, 231 (Tex.1991). This case is no exception. We find that the exercise of jurisdiction over Ian by the courts of this state will not offend traditional notions of fair play and substantial justice. First, that Ian does not reside in Texas is not persuasive in deciding personal jurisdiction. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (stating it is an inescapable fact of modern commercial life that

a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating need for physical presence within the state in which business is conducted). The State of Texas has a strong interest in the regulation of commercial transactions entered into by its citizens and in providing a forum in which disputes involving its citizens can be resolved. This interest in litigation becomes even stronger when, as here, the tort is alleged to have been committed in whole or in part in Texas. We hold that Ian has not met his burden of showing that under the facts of this case, the exercise of personal jurisdiction over him individually offends traditional notions of fair play and substantial justice.

Because we find personal jurisdiction over Ian on tort grounds, we need not address whether Texas may exert personal jurisdiction over Ian for allegedly contracting with a Texas resident. *See, e.g., Puri v. Mansukhani,* 973 S.W.2d 701, 708 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (stating nonresident defendant must negate *all bases* of personal jurisdiction to prevail in a special appearance). Accordingly, we overrule appellants' first point of error and also overrule appellants' seventh point of error, as to Ian.

### 2. SSI

Brewton maintains that the trial court properly concluded that it could assert personal jurisdiction over SSI under any of three theories: (1) SSI committed mail fraud, a predicate act of civil racketeering, when it sold copies of Brewton's book in Texas without paying him; (2) SSI sold copies of Brewton's book in Texas; and (3) SSI is a successor-in-interest to SPI. The first two theories are based on SSI's own contacts with this state. The third is based on Brewton's theory that SSI is legally responsible for the actions and omissions of SPI. SSI contends that finding jurisdiction on any of these bases is incorrect as a matter of law and not supported by factually sufficient evidence.

#### a. SSI's Own Contacts With Texas

■ SSI argues that the evidence in the record does not establish that SSI, apart from any connection with SPI, had the minimum contacts with Texas necessary to establish personal jurisdiction. Brewton counters that he presented evidence showing that (1) SSI sold copies of Brewton's book in Texas in 1996 and in 1999, including by mail,[7] without paying Brewton royalties, and (2) SSI advertised Brewton's book for sale in Texas.

As previously noted, the record contains no definitive evidence that books sold at the Barnes & Noble store came directly from SSI, or that SSI purposefully directed them to Texas. The only evidence of any sales activity by SSI in Texas is the unsolicited sale of three books to the Brenham bookstore, which were delivered with an SSI catalog. Because SSI had no contract with Brewton and no obligation to pay him royalties for the sale of any books, there is no conduct associated with the sale of these three books, or the delivery of the accompanying catalog, that could support a finding of specific jurisdiction over SSI.

■ Brewton's reliance on his assertion that mail fraud, as a predicate act to his RICO action, is conduct sufficient to support specific jurisdiction over SSI is also misplaced. Notably, Brewton's pleadings do not assert that SSI engaged in any of the actions alleged to constitute a violation of RICO, nor does Brewton assert SSI

---

**7.** Mail fraud is alleged as a predicate act to Brewton's RICO action.

engaged in the predicate act of mail fraud.[8] Because the pleadings asserting the RICO claims allege no conduct *by SSI* associated with book sales in Texas, no cause of action against SSI arises from that contact. It is the non-resident's purposeful conduct, not the activity of the plaintiff or others, that must have caused the contact. *See Guardian Royal Exch.*, 815 S.W.2d at 227. Moreover, to sustain specific jurisdiction, the litigation must result from the alleged injuries that arise out of or relate to those activities. *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 774 (Tex.1995). We conclude SSI's contacts with the forum were fortuitous and attenuated and that the record fails to establish the requisite "strong nexus" between these contacts and the claims Brewton asserts against SSI in this litigation to support specific jurisdiction. *See McDermott v. Cronin*, 31 S.W.3d 617, 622 (Tex.App.—Houston [1st Dist.] 2000, no pet.).

To the extent the trial court's denial of SSI's special appearance was based on a finding that SSI maintained sufficient minimum contacts to sustain specific jurisdic-tion, that ruling is not supported by factually sufficient evidence.

#### b. SSI's Contacts through SPI

■ We now consider whether SSI is subject to personal jurisdiction as an alleged successor-in-interest to SPI, through SPI's contacts with Texas. Brewton argues that, through SSI's purchases of SPI's book inventory from the bankruptcy trustee, SSI became a successor-in-interest to SPI.[9] Under a successor corporation liability theory, a nonresident defendant corporation not otherwise subject to personal jurisdiction in the forum state becomes so by virtue of succeeding to a corporation that was subject to personal jurisdiction in the forum state. *In re Celotex Corp.*, 124 F.3d 619, 628 (4th Cir.1997).

Before addressing Brewton's successor liability theory as a basis for specific jurisdiction, we first note that SSI did not acquire any SPI stock or agree to assume any liabilities of SPI, nor were the two companies consolidated by formal corporate merger. Brewton's successor liability theory is based entirely on the fact that SSI acquired certain assets of SPI's bank-

---

8. In his pleading, Brewton claims only the individual defendants, which he identifies as "Ian Shapolsky, Anita Shapolsky, and Lisa Cohen Goldberg ... committed mail fraud, a predicate act, by intentionally and knowingly causing [SSI] and Sure Seller Books, Inc. to transmit by mail Brewton's book to Texas for sale and by receiving funds from such sale in Texas without paying any royalty to Brewton, all in violation 18 U.S.C. § 1841 and 18 U.S.C. § 1961(1)(B)."

9. Generally successors are not liable for the torts of their predecessors. In *Panther Pumps & Equip. Co., Inc. v. Hydrocraft, Inc.*, 566 F.2d 8 (7th Cir.1977), the Seventh Circuit Court of Appeals summarized the traditional rule of successor liability, stating:

The well settled rule of American jurisdictions ... is that a corporation which purchases the assets of another corporation does not, by reason of succeeding to the

ownership of property, assume the obligations of the transferor corporation.... Exceptions to this rule exist where (a) the purchasing corporation expressly or impliedly agrees to assume the liabilities of the seller, (b) the transaction amounts to a consolidation or merger of the two companies, (c) the purchasing corporation is merely a continuation of the selling corporation, or (d) the transaction is entered into fraudulently to escape liability.

*Id.* at 24–25. If a court has personal jurisdiction over the predecessor-in-interest, once successor liability is established, personal jurisdiction over the successor-in-interest necessarily exists. This result follows because the acts of the predecessor-in-interest are imputed to the successor. *Select Creations, Inc. v. Paliafito Am., Inc.*, 852 F.Supp. 740, 765 (E.D.Wis.1994).

ruptcy estate, a transaction which, as previously noted, was accomplished via a court-approved sale.

■ The Texas Business Corporations Act governs the liability of an acquiring corporation. It provides that the purchase of all or substantially all of the property or assets of the seller corporation "does not make the acquiring [entity] responsible or liable for any liability or obligation of the selling corporation unless the acquiring entity *expressly assumes* the liability or obligation, or unless another statute expressly provides to the contrary." *Lockheed Martin Corp. v. Gordon,* 16 S.W.3d 127, 134–35 (Tex.App.—Houston [1st Dist.] 2000, pet. denied) (citing TEX. BUS. CORP. ACT ANN. art. 5.10(B)(2) (Vernon Supp.2001) (emphasis added));[10] *see Mudgett v. Paxson Mach. Co.,* 709 S.W.2d 755, 758 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.). Brewton acknowledges this is the rule in Texas, but argues that two exceptions to this rule apply in this case: (1) where the purchasing corporation is a "mere continuation" of the selling corporation, and/or (2) where the transaction is entered into fraudulently to escape liability.

### i. "Mere Continuation" Exception

■ Brewton cites *W. Res. Life Ins. Co. v. Gerhardt* in support of his argument that "mere continuation" is an exception to limited successor liability. *See* 553 S.W.2d 783, 786 (Tex.Civ.App.—Austin 1977, writ ref'd n.r.e.). In *Gerhardt,* the court applied the de facto merger doctrine to find that the purchaser of another company's assets assumed the selling corporation's tort liability. *Id.* at 787. However, the Texas Legislature rejected application of the de facto merger doctrine when it

amended article 5.10 in 1979. The purpose of the amendment was to "preclude the application of de facto merger in any sale, lease, exchange or other disposition of all or substantially all the property and assets of a corporation...." TEX. BUS. CORP. ACT ANN. art. 5.10 cmt. The amendment added section B, which provides:

> A disposition of any, all, or substantially all, of the property and assets of a corporation, whether or not it requires the special authorization of the shareholders of the corporation, effected under Section A of this article ... or otherwise ...:
>
> (1) is not considered to be a merger or conversion pursuant to this Act or otherwise; and
>
> (2) except as otherwise expressly provided by another statute, does not make the acquiring corporation ... responsible or liable for any liability or obligation of the selling corporation that the acquiring corporation ... did not expressly assume.

*Id.* Art.. 5.10(B); *see also Suarez v. Sherman Gin Co.,* 697 S.W.2d 17, 20 (Tex. App.—Dallas 1985, writ ref'd n.r.e.) (finding "the legislature's prompt action to override *Gerhardt* and statutorily preclude application of the de facto merger doctrine in Texas clearly states a public policy opposed to the doctrine.").

In *Mudgett v. Paxson Mach. Co.,* the Corpus Christi Court of Appeals rejected the "mere continuation" theory as contrary to the legislative intent of article 5.10(B). 709 S.W.2d 755, 758 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.) (determining, in a successor liability case, whether an asset "purchase constituted a 'de facto

---

**10.** "Texas strongly embraces the non-liability rule. To impose liability for a predecessor's torts, the successor corporation must have expressly assumed liability." TEX. BUS. CORP. ACT art. 5.10(B)(2). The statute protects both Texas corporations and foreign corporations. *Lockheed,* 16 S.W.3d at 139.

merger or [a] continuation under the doctrine of successor liability.'"). The *Mudgett* court reasoned that "mere continuation" was an even more liberal means of imposing liability upon the acquiring corporation in a purchase of assets transaction than is the de facto merger doctrine the Legislature expressly rejected. *Id.* The court concluded, "[c]ertainly if the de facto merger doctrine is contrary to the public policy of our state, so must be the mere continuation doctrine." *Id.* The court declined to impose liability upon an acquiring corporation under either theory "in the face of clear legislative intent to the contrary." *Id.*

Mindful of the legislative intent behind article 5.10, we find that just as SPI's liability may not be transferred to SSI under a "mere continuation" theory, neither may SPI's contacts be attributed to SSI for purposes of establishing personal jurisdiction.

### ii. Fraudulent Transfer Exception

■ Brewton argues that Texas recognizes an exception to article 5.10's limitation of liability for a purchasing corporation where the transfer of assets in the sale was fraudulent.[11] In support, Brewton relies on *Phippen v. Deere & Co.*, 965 S.W.2d 713, 726 (Tex.App.—Texarkana 1998, no pet.), a case in which the defendant/purchaser complained that

there was insufficient evidence for the jury's finding that he was liable under a theory of successor liability for the debts of the predecessor corporation, because the defendant's purchase of motor homes was a "fraudulent endeavor by the original corporation to escape liability." *Id.* The trial court had instructed the jury that the defendant/purchaser was liable for such obligations if: (1) the predecessor and defendant/purchaser had engaged in a fraudulent transaction in an effort to escape liability; or if (2) defendant/purchaser was a mere continuation of the seller. *Id.* The court in *Phippen* concluded that the record was sufficient to show that the defendant/purchaser and the motor home seller had engaged in a fraudulent transaction to escape liability and that the evidence was sufficient to show that the defendant/purchaser was a "mere continuation" of the seller. *Id.* The court then found that either of these circumstances was enough to support the jury's finding that the defendant/purchaser was liable for the seller's obligations. *Id.* Notably, the only case the *Phippen* court cited in its analysis was *Gerhardt*, which was effectively superseded by the amendment to article 5.10. *Id.* at 725–26.

Other states recognize as many as four exceptions to the rule of successor non-liability.[12] However, the "Business Corpo-

---

**11.** Brewton argues he presented special appearance evidence which shows that the asset transfer was a "sham" perpetrated by Anita Shapolsky on the bankruptcy court and that after SPI declared bankruptcy, "the Shapolskys were 'doing business as usual' under the Sure Seller [SSI] name." Brewton also contends that appellants presented no evidence to refute Brewton's claim of this "sham transaction."

**12.** The Third Restatement of the Law of Torts for Products Liability, states the majority rule as follows:

[A] successor business that purchases only the assets of another business is not subject to liability for harm caused by defective products sold commercially by the predecessor unless:

(1) in acquiring the assets, the successor agrees to assume liability;

(2) the acquisition results from a fraudulent conveyance to escape liability or the debts or liabilities of the predecessor;

(3) the acquisition constitutes a consolidation or merger with the predecessor; or

ration Act controls in Texas." *Lockheed Martin Corp. v. Gordon*, 16 S.W.3d 127, 135 and n. 6 (Tex.App.—Houston [1st Dist.] 2000, pet. denied) (pointing out that the Texas Legislature rejected the third and fourth exceptions of the Restatement; stating "Article 5.10(B)(1) eliminates the 'de facto merger' doctrine, the third exception under the Restatement"; and citing *Mudgett*, which rejected the "mere continuation" theory, the fourth exception recognized by the Restatement, as contrary to the legislative intent of article 5.10(B)); *see also McKee v. Am. Transfer & Storage*, 946 F.Supp. 485, 486–87 (N.D.Tex. 1996) (Texas law does not generally recognize successor liability for subsequent purchases of corporate assets.); *Mudgett v. Paxson Mach. Co.*, 709 S.W.2d 755, 756–59 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.) ("The Texas Business & Corporations Act eliminates the doctrine of implied successor liability.").

Article 5.10 expressly delineates the two exceptions to successor non-liability which apply in the context of an asset purchaser. The first arises where the purchaser *expressly assumes* the seller's liabilities. The second comes into play where an exception is *"expressly provided by another statute."* The first exception clearly does not apply because SSI never agreed to assume SPI's liabilities or obligations. The second exception is also inapplicable. Brewton does not cite, nor does our research reveal, any other statute which expressly provides an exception to the rule of successor non-liability for purchasers of all or substantially all of a corporation's assets.

We find that SSI has no successor liability by virtue of its purchase and subsequent handling of SPI's book inventory, and even assuming that Texas could assert personal jurisdiction over SPI, we find that Texas courts may not assert personal jurisdiction over SSI on the basis of its purchase of SPI's book inventory. The second and third points of error are sustained.

### 3. Anita Shapolsky

■ Appellants' fourth through seventh points of error assert that the trial court erred in finding that Anita is subject to jurisdiction in Texas. Brewton argues that Texas courts may assert jurisdiction over Anita because (1) she has waived her special appearance (contested in appellants' sixth point of error), and alternatively (2) she is an alter ego of both SPI and SSI (contested in appellants' fourth, fifth and seventh points of error).

Brewton asserts that Anita Shapolsky waived her special appearance by, *inter alia*, filing a motion for protection and for sanctions before her special appearance was decided. Anita filed this motion, together with a notice of oral hearing, set for February 12, 1998, on February 4, 1998. In the motion, Anita requested that the court (1) restrain Brewton from entering the law offices of appellants'/defendants' attorney, Emmons & Associates; and (2) sanction Brewton $2,000.[13] The trial court

---

(4) the acquisition results in the successor becoming a continuation of the predecessor.
*Lockheed Martin Corp. v. Gordon*, 16 S.W.3d 127, 134 (Tex.App.—Houston [1st Dist.] 2000, pet. denied).

**13.** Anita's motion also requested that the court order Brewton to (1) pay the $500 in sanctions the court previously awarded for a violation of Rule 21, because the amount ordered remained outstanding; and (2) pay another $500 for failure to pay the $500 sanction award. It is unclear whether Anita's request for $2,000 in additional sanctions was solely for Brewton's alleged unauthorized entry into Anita's counsel's law offices or whether the request for $2,000 in sanctions includes the $1,000 in sanctions Brewton requested for

signed an order denying this motion, at least insofar as the trespass allegations, which formed the basis for a request for a restraining order, on March 17, 1998.[14] Appellant's special appearance was not denied until June 1, 2000.

■ An objection to a Texas court's exercise of jurisdiction over a nonresident must be made by special appearance filed under Rule 120a of the Texas Rules of Civil Procedure. *See* Tex.R. Civ. P. 120a(2). Rule 120a "requires strict compliance." *Morris v. Morris,* 894 S.W.2d 859, 862 (Tex. App.—Fort Worth 1995, no writ). A special appearance must be made and determined on sworn motion *prior to any other plea, pleading, or motion that seeks affirmative relief.* Tex.R. Civ. P. 120a(1)-(2); *Dawson–Austin v. Austin,* 968 S.W.2d 319, 323 (Tex.1998) (noting that the test for a general appearance is whether party requests affirmative relief inconsistent with assertion that the district court lacks jurisdiction). Any appearance before judgment, which is not in compliance with Rule 120a, constitutes a general appearance. Tex.R. Civ. P. 120a(1); *Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 201 (Tex.1985); *see Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 n. 14, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) ("[T]he personal jurisdiction requirement is a waivable right."). When a party generally appears, the trial court can exercise jurisdiction over the party without violating the party's due process rights. *Kawasaki,* 699 S.W.2d at 201. A party contesting jurisdiction must not seek affirmative relief on any question other than that of the court's jurisdiction before the special appearance is determined. Tex.R. Civ. P. 120a(2) (providing that a special appearance "shall be

heard and determined before ... any other plea or pleading may be heard."). Any intervening appearance to invoke the trial court's judgment about a "question other than the court's jurisdiction" is a general appearance. *Angelou v. African Overseas Union,* 33 S.W.3d 269, 275 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

Anita's motion for protection and for sanctions states that it was "subject to ... her previously filed special appearance." However, in this motion, Anita argued issues unrelated to her special appearance prior to obtaining a ruling on the special appearance. She sought affirmative relief from the court when she requested a temporary restraining order and when she requested sanctions that were at least partially unrelated to discovery. *See* Tex.R. Civ. P. 120a(2) ("Any motion to challenge the jurisdiction provided for herein *shall be heard and determined before* a motion to transfer venue or *any other plea or pleading may be heard.*") (emphasis added); *Liberty Enters., Inc. v. Moore Transp. Co., Inc.,* 690 S.W.2d 570, 571–72 (Tex.1985) (finding that party waived special appearance with affirmative action agreeing to the trial court's order reinstating the cause of action); *Landry v. Daigrepont,* 35 S.W.3d 265, 267–68 (Tex.App.—Corpus Christi 2000, no pet.) (finding that party waived his special appearance by approving the order granting the new trial *before the special appearance was determined* ). In light of this finding of waiver, appellant's sixth point of error is overruled. Accordingly, because we find that Anita waived her special appearance, we need not address whether Texas may assert personal jurisdiction over Anita under an "alter-ego" theory, as asserted in appel-

failure to pay the $500 sanction award for violation of Rule 21. Regardless, it is clear that Anita sought at least $1,000 in sanctions for Brewton's alleged unauthorized entry.

14. The trial court's case inquiry sheet shows that the court denied Anita's motion on February 12, 1998, the date for which she had noticed the hearing.

lants' fourth, fifth, and seventh points of error.

### V. Conclusion

We affirm the trial court's denial of Ian Shapolsky's special appearance because he did not successfully negate specific jurisdiction. We affirm the trial court's denial of Anita Shapolsky's special appearance because, in seeking affirmative relief from the trial court before the determination of her special appearance, she made a general appearance and waived her jurisdictional challenge. Finally, we reverse the trial court's denial of SSI's special appearance because SSI successfully negated all bases of personal jurisdiction, and remand this case with instructions to dismiss the claims against SSI for lack of personal jurisdiction.