OPINION




No. 04-03-00098-CV



Ronald STERN and John Cowan,


Appellants



v.



KEI CONSULTANTS, LTD.,


Appellee



From the 225th Judicial District Court, Bexar County, Texas


Trial Court No. 2002-CI-00168 (1)


Honorable David Peeples, Judge Presiding (2)



Opinion by: Sarah B. Duncan, Justice


Sitting: Catherine Stone, Justice

 Sarah B. Duncan, Justice

 Karen Angelini, Justice


Delivered and Filed: October 8, 2003


AFFIRMED

 Ronald Stern and John Cowan appeal the trial court's order denying their special appearance. We
affirm the trial court's order and, in so doing, join the Fort Worth Court of Appeals in holding the fiduciary
shield doctrine does not "protect[] a corporate officer or employee from the trial court's ...exercise of
specific jurisdiction as to torts for which the officer or employee may be held individually liable." SITQ
E.U., Inc. v. Reata Rest., Inc., 111 S.W.3d 638, 650-51 (Tex. App.-Fort Worth May 22, 2003, pet.
filed).

Factual and Procedural Background


 For a number of years, Pasadena Pulp Company, L.P. owned a pulp mill in Pasadena, Texas. To
facilitate the discharge of its waste water, Pasadena Pulp entered into a contract with the Gulf Coast Waste
Disposal Authority to discharge up to 44 million gallons of waste water per day into the Washburn Tunnel
Facility. However, by 1999, Pasadena Pulp had closed its pulp mill, thus significantly decreasing its
discharge and significantly increasing the waste water treatment costs not only for it but also for the other
Washburn Tunnel Facility participants. Pasadena Pulp offered its excess capacity to the other participants;
but each refused. Thereafter, in October 1999, Pasadena Pulp entered into an agreement - the Industrial
Waste Water Marketing and Management Agreement - with KEI Consultants, L.P. to market and sell
Pasadena Pulp's excess waste water treatment capacity to third parties.

 The initial term of the Agreement was from October 13, 1999 until October 1, 2005. However,
if KEI failed to reach certain specified performance goals, the Agreement permitted Pasadena Pulp to
terminate the agreement earlier. Thus, Pasadena Pulp was contractually permitted to terminate the
Agreement before October 1, 2005 if KEI failed to obtain approved contracts to assume 1.5 million gallons
per day of Pasadena Pulp's excess waste water treatment capacity within eighteen months. KEI alleges
it met this performance goal by obtaining a contract from Valero Refining Company to commit 1.728 million
gallons of waste water per day to the Washburn Tunnel Facility. However, Pasadena Pulp did not approve
the Valero contract because, in its view, it required Pasadena Pulp to assume duties and responsibilities
beyond those contemplated in the Agreement. After protracted negotiations failed to yield an effective
renegotiated agreement, KEI served Pasadena Pulp with written notice of default and, shortly thereafter,
filed this suit alleging breach of contract, breach of the duty of good faith and fair dealing, fraudulent
concealment, and breach of a confidential relationship against Pasadena Pulp. On the tort claims, KEI also
sued John Cowan and Ronald Stern, who participated in the negotiations on Pasadena Pulp's behalf.
Cowan and Stern filed a special appearance, which the trial court denied. Cowan and Stern, both citizens
and residents of Canada, filed this interlocutory appeal. See Tex. Civ. Prac. & Rem. Code Ann.
§ 51.014(a)(7) (Vernon Supp. 2002).

Burden in the Trial Court and Standard of Review on Appeal


 "The plaintiff bears the initial burden of pleading allegations sufficient to bring a nonresident
defendant within the provisions of the long-arm statute." American Type Culture Collection, Inc. v.
Coleman, 83 S.W.3d 801, 807 (Tex. 2002), cert. denied, 123 S.Ct. 1271 (2003). "But upon filing a
special appearance, the nonresident defendant assumes the burden to negate all the bases of personal
jurisdiction alleged by the plaintiff." Id. "Whether a court has personal jurisdiction over a defendant is a
question of law." Id. at 805-06. "But in resolving this question of law, a trial court must frequently resolve
questions of fact." Id. at 806. "On appeal, the trial court's determination to grant or deny a special
appearance is subject to de novo review, but appellate courts may be called upon to review the trial court's
resolution of a factual dispute." Id. 

 "When the trial court does not issue findings of fact, reviewing courts should presume that the trial
court resolved all factual disputes in favor of its judgment." Id. "When the appellate record includes the
reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal
and factual sufficiency in the appropriate appellate court." BMC Software Belgium, N.V. v. Marchand,
83 S.W.3d 789, 795 (Tex. 2002). (3) "For legal sufficiency points, if there is more than a scintilla of evidence
to support the finding, the no evidence challenge fails." Id. A factual sufficiency challenge fails only if the
finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly
unjust. E.g., In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

Applicable Law


 As to the broad outlines of the applicable law of personal jurisdiction, the parties are in agreement.
It is only at the margin that they disagree, as discussed below.

General Principles


 A Texas court may exercise jurisdiction over a nonresident defendant if the exercise of jurisdiction:
(1) is authorized by the Texas long-arm statute; and (2) comports with the state and federal constitutional
guarantees of due process. Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C., 815
S.W.2d 223, 226 (Tex. 1991). Since "[t]he Texas long-arm statute reaches 'as far as the federal
constitutional requirements of due process will allow,'" "the Texas long-arm statute requirements are
satisfied if exercising jurisdiction comports with federal due process limitations." American Type Culture,
83 S.W.3d at 806 (citing and quoting Guardian Royal, 815 S.W.2d at 226).

 Federal due process permits the exercise of jurisdiction over a nonresident defendant if: (1) the
defendant has established "minimum contacts" with the forum state; and (2) the exercise of jurisdiction
comports with "traditional notions of fair play and substantial justice." American Type Culture, 83 S.W.3d
at 806 (citing International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). Sufficient contacts are
established if the defendant has "purposefully avail[ed]" himself of the privileges and benefits of conducting
business in the forum state. American Type Culture, 83 S.W.3d at 806 (citing Burger King Corp. v.
Rudzewicz, 471 U.S. 462, 474-76 (1985)). 

 "A defendant's contacts with a forum can give rise to either specific or general jurisdiction."
American Type Culture, 83 S.W.3d at 806. "For a court to exercise specific jurisdiction over a
nonresident defendant, two requirements must be met: (1) the defendant's contacts with the forum must
be purposeful, and (2) the cause of action must arise from or relate to those contacts." Id. "General
jurisdiction ..., on the other hand, allows a forum to exercise jurisdiction over a defendant even if the cause
of action did not arise from or relate to a defendant's contacts with the forum." Id. at 806-07. "General
jurisdiction is present when a defendant's contacts with a forum are 'continuous and systematic,' a more
demanding minimum-contacts analysis than specific jurisdiction." Id. at 807. "Because of the unique and
onerous burden placed on a party called upon to defend a suit in a foreign legal system, the minimum
contacts analysis is particularly important when the defendant is from a different country." BMC Software,
83 S.W.3d at 795.

"Fiduciary Shield" Doctrine


 Throughout this proceeding, Stern and Cowan have argued that "Texas law is clear: contacts with
the forum state only in the capacity as an officer, director, or representative of a corporation do not create
personal jurisdiction over the person. .... For this reason, Stern and Cowan cannot be subjected to either
the general or specific jurisdiction of Texas courts." KEI argues, on the other hand, that "the so-called
'fiduciary shield' doctrine is [a] narrow legal principle that applies only to contract claims and only to the
exercise of general jurisdiction."

 "[T]he fiduciary-shield doctrine ... holds that an individual's transaction of business within the state
solely as a corporate officer does not create personal jurisdiction over that individual though the state has
in personam jurisdiction over the corporation ...." Stuart v. Spademan, 772 F.2d 1185, 1197 (5th Cir.
1985). The doctrine's application by the Texas intermediate appellate courts was extensively reviewed by
the Fort Worth Court of Appeals in Brown v. General Brick Sales Co., 39 S.W.3d 291, 298-99 (Tex.
App.-Fort Worth 2001, no pet.). Summarizing, the court concluded as follows:

 These cases reveal a certain pattern. First, it appears that the fiduciary shield doctrine has
not been explicitly adopted by the Texas Supreme Court. Second, where intermediate
appellate courts have applied some aspects of the fiduciary shield doctrine, they have
limited its application to jurisdictional claims based on the theory of general jurisdiction as
opposed to specific jurisdiction. Third, since Texas courts are to always exercise
jurisdiction to the limits of federal due process, we should look to the Supreme Court's
analysis in the Calder (4) case where that court refused to create a blanket exception to
jurisdiction that fails to test each defendant's actions and contacts with the forum
separately.


Id. at 300. We agree with the Fort Worth Court of Appeals and join it in holding that the fiduciary shield
doctrine does not protect "[a] corporate officer or employee ... from the exercise of specific jurisdiction
as to torts for which the officer or employee may be held individually liable." SITQ E.U., Inc. v. Reata
Rest., Inc., 111 S.W.3d 638, 651 (Tex. App.-Fort Worth 2003, pet. filed). (5)

Fair Play and Substantial Justice


 "Once it has been determined that the nonresident defendant purposefully established minimum
contacts with the forum state, the contacts are evaluated in light of other factors to determine whether the
assertion of personal jurisdiction comports with fair play and substantial justice." Guardian Royal, 825
S.W.2d at 228. "These factors include (1) 'the burden on the defendant,' (2) the interests of the forum state
in adjudicating the dispute, (3) 'the plaintiff's interest in obtaining convenient and effective relief,' (4) 'the
interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and (5) 'the
shared interest of the several States in furthering fundamental substantive social policies.'" Id. (quoting
Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113 (1987); Burger King Corp. v.
Rudzewicz, 471 U.S. 462, 477 (1985); World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292
(1980)). "[W]hen an 'international dispute' is involved, the following factors, when appropriate, should also
be considered: (a) the unique burdens placed upon the defendant who must defend itself in a foreign legal
system; and (b) the procedural and substantive policies of other nations whose interests are affected as well
as the federal government's interest in its foreign relations policies." Guardian Royal, 815 S.W.2d at 229.
But "when the nonresident defendant has purposefully established minimum contacts with the forum state,"
"[o]nly in rare cases ... will the exercise of jurisdiction not comport with fair play and substantial justice."
Id. at 231. Thus, the burden is on the defendant to "'present a compelling case that the presence of some
other considerations would render jurisdiction unreasonable.'" Id. (quoting Burger King, 471 U.S. at 477).

Cowan's Contacts with Texas


 Cowan argues the trial court erred in denying his special appearance because he did not have the
requisite minimum contacts necessary to the assertion of general or specific jurisdiction over him. We
disagree. 

 In its petition, KEI alleges Cowan, a Pasadena Pulp vice president, "admitted to KEI that
[Pasadena Pulp] had always intended to renegotiate the [Agreement]" and that "such an intention was
never discussed with KEI during any of the lengthy negotiations of the Agreement." From these (and other)
predicate facts, KEI alleges Cowan "fraudulently concealed from [KEI] the fact that [Pasadena Pulp,
Cowan, and Stern] always intended to renegotiate the Agreement and misrepresented their intent
throughout this process"; and KEI relied upon Cowan's misrepresentations regarding Pasadena Pulp's
intent to perform under the Agreement - rather than to force its renegotiation - to its detriment. "However,
the fact that [the defendant] is alleged to have committed a tort in Texas is not dispositive because that,
alone, does not give Texas courts jurisdiction over a nonresident. Rather, there must be a substantial
connection between the contact and the cause of action in the forum state." Shapolsky v. Brewton, 56
S.W.3d 120, 133 (Tex. App.-Houston [14th Dist.] 2001, pet. denied).

 In his deposition, Cowan admits he participated in a meeting that he characterizes as "the start of
the discussions on how the marketing [of Pasadena Pulp's excess waste water treatment capacity] might
be done" in Pasadena, Texas. Between this initial meeting and October 13, 1999, the effective date of the
Agreement, Cowan met with a representative of KEI around twenty-five times in Texas. In fact, Cowan
considers himself one of the principal negotiators for Pasadena Pulp of the Agreement. Cowan also met
five to ten times with other KEI representatives in his office in the Pasadena Pulp offices in Pasadena,
Texas. While working at his Pasadena Pulp Office, Cowan stayed in an apartment rented for him by
Pasadena Pulp in Houston, Texas. Cowan also participated in the renegotiation of the Agreement and was
in fact Pasadena Pulp's primary negotiator. From the end of 1999 through 2001, Cowan attended more
than twenty-five meetings in Pasadena, Texas. Cowan also met once or twice with Valero's mill manager
or assistant manager at the Valero mill in Pasadena, Texas. Similarly, he received drafts of the Agreement
and offered modifications while in Pasadena, Texas. If he received a draft while he was in Vancouver, he
delivered his changes or modifications in Texas. 

 At this stage of the proceeding, this court is not charged with determining the merit of KEI's
fraudulent concealment allegations. See Zac Smith & Co. v. Otis Elevator Co., 734 S.W.2d 662, 666
(Tex. 1987), cert. denied, 484 U.S. 1063 (1988). Rather, we must determine whether, in light of KEI's
allegations, the evidence establishing that Cowan served as Pasadena Pulp's principal negotiator with KEI,
a Texas limited partnership, regarding an agreement that was to have been performed in Texas establishes
a substantial connection between Cowan and the State of Texas. We hold that it does. See, e.g., D.H.
Blair Inv. Banking Corp. v. Reardon, 97 S.W.3d 269, 278 (Tex. App.-Houston [14th Dist.] 2002, pet.
dism'd w.o.j.) (refusing to apply fiduciary shield doctrine to nonresidents who allegedly "made false
representations at meetings in Texas for the purpose of inducing Texas residents to approve ...
recapitalization and subsequent IPO"); Shapolsky, 56 S.W.3d at 134 ("Where a defendant sends false
information into a state, knowing it will be relied upon by a resident of the forum state, there is a foreseeable
consequence of direct economic injury to the resident at its domicile. Therefore, if the alleged tortfeasor
knows that the brunt of the injury will be felt by a particular resident in the forum, it must reasonably
anticipate being haled into court there to answer for its actions.").

Stern's Contacts with Texas


 Stern also argues the trial court erred in denying his special appearance because he did not have
the requisite minimum contacts for the trial court to exercise either general or specific jurisdiction over him.
We again disagree.

 In its petition, KEI alleges that "Cowan and Stern advanced a variety of different excuses and
reasons why [Pasadena Pulp] could not execute the Valero Client Contract"; Pasadena Pulp indicated in
a July 25, 2001 letter to KEI that "Stern had again changed the deal and now was insisting that KEI put
up 35% of the capital required (approximately $805,000) to purchase the KMLT pipeline and that KEI
agree to more generous CRC terms than previously agreed." From these (and other) predicate facts, KEI
alleges "[Pasadena Pulp], John Cowan, and Ronald Stern fraudulently concealed from [KEI] the fact that
they always intended to renegotiate the Agreement and misrepresented their intent throughout this process"
and "have consistently breached" their "fiduciary duty to disclose all material facts and at all times act in
good faith."

 Although Stern has resided in Vancouver, British Columbia since 1969, he and his family (or a
family trust) own all of the company that owns a majority interest in and ultimately controls Pasadena Pulp,
which has its principal place of business in Pasadena, Texas. Indeed, Stern is the vice-president of the
general partner of Pasadena Pulp.

 Stern did not participate in the initial contract negotiations directly, although he discussed them with
Cowan while he was in Texas. Stern also met with a representative of KEI to "get[] an update on how the
marketing was proceeding" in Pasadena, Texas. Stern was directly involved in the renegotiations of the
Agreement and had a number of discussions about them, either while he was in Texas or with people who
were in Texas. Stern signed a letter dated September 7, 2001 and addressed to KEI on Pasadena Pulp
letterhead and showing an address in Pasadena, Texas. In this letter, Stern states that he and a
representative of KEI "both have invested an inordinate amount of time and energy, in trying to craft a new
agreement that would allow us to provide the necessary new services and requirements call[ed] for in the
currently unsigned Valero Client Contract"; and "[b]efore concluding that it is just not possible for us to
reach a mutually satisfactory new agreement ..., I would like to put forward one last attempt at a
compromise." Stern also participated in the discussions leading up to Pasadena Pulp's decision not to
execute the Valero contract. Thus, while Stern may not have acted as Pasadena Pulp's principal negotiator
in the negotiation of the Agreement, it appears he controlled Pasadena Pulp's efforts to renegotiate the
Agreement to KEI's detriment. In light of this evidence, we hold there is a substantial connection between
Stern and the State of Texas. See Reardon, 97 S.W.3d at 278.

"Fair Play and Substantial Justice"


 As noted above, the second step in our jurisdictional analysis is to determine whether the
nonresident defendant has met his burden to "present a compelling case that the presence of some other
considerations would render jurisdiction unreasonable." Guardian Royal, 815 S.W.2d at 231 (quoting
Burger King, 471 U.S. at 477). Stern and Cowan have not met this burden here.

 Stern and Cowan first argue that the mere fact that they are Canadian citizens and residents
establishes that "having to defend this suit in Texas represents a significant burden to each of them." The
record indicates otherwise. As vice president of Pasadena Pulp's general partner, Stern has traveled to
Texas numerous times. Similarly, as president and secretary of Pasadena Pulp, Cowan "travel[s] back and
forth between Canada and Texas," and, in particular, traveled to Texas "many, many" times during the last
ten years; indeed, he has stayed for six to seven weeks at a time (without returning to Canada) in an
apartment maintained for him by one or another of the Texas-based companies for which he has done
work. Both men traveled to Texas for their special appearance depositions, during which each was
accompanied by an attorney from Vinson & Elkins in Houston, Texas. While in Houston for his deposition,
Stern interviewed a prospective employee for Texas Paper Mill, Inc., another corporation with its principal
place of business in Pasadena, Texas. Stern or his family trust also ultimately owns the controlling interest
in Pasadena Paper Co., Ltd., which owns and operates a paper mill in Pasadena, Texas. And Stern has
traveled to Texas on business a dozen or so times before. The record thus establishes that traveling to
Texas and engaging the services of a Texas attorney do not pose an obstacle to either man.

 Stern and Cowan also argue that "neither ... ever anticipated that their conduct was sufficient to
expose them to suit in Texas." We find this assertion difficult to believe. Both men knew full well they were
dealing with representatives of a Texas company; they were allegedly attempting to renegotiate a contract
to the disadvantage of that Texas company; and the contract was to be performed in Texas by companies
operating in Texas. Finally, Stern and Cowan assert "it is fundamentally unfair to allow the exercise of
jurisdiction over nonresident foreign citizens who merely participate in contract negotiations on behalf of
an employer." In support of their argument, Stern and Cowan cite Valsangiacomo v. Americana Juice
Import, Inc., 35 S.W.3d 201 (Tex. App.-Corpus Christi 2000, no pet.). Stern's and Cowan's reliance
on Valsangiacomo is misplaced for at least two reasons. First, the defendant in Valsangiacomo was a
citizen of Spain, not Canada - a country that shares not only the North American continent but a unique
relationship with the United States. Even more fundamentally, the Valsangiacomo Court expressly held
that it "need not examine whether the assertion of personal jurisdiction over [the defendant] would offend
traditional notions of fair play and substantial justice," because it had already "concluded [the defendant]
established it did not have minimum contacts with Texas." Id. at 210.

 It is readily apparent that "[t]he State of Texas has a strong interest in the regulation of commercial
transactions entered into by its citizens and in providing a forum in which disputes involving its citizens can
be resolved." Shapolsky, 56 S.W.3d at 135. "This interest in litigation becomes even stronger when, as
here, the tort is alleged to have been committed in whole or in part in Texas." Id. Certainly, KEI has a
strong interest in litigating in Texas, where all of its employees and records are located. In light of the
foregoing, we hold the trial court did not err in finding that exercising jurisdiction over Stern and Cowan
comports with traditional notions of fair play and substantial justice.

Conclusion


 We hold the fiduciary shield doctrine does not insulate a corporate officer or employee from the
trial court's exercise of specific jurisdiction and thus consider the totality of Stern's and Cowan's contacts
with the State of Texas as reflected in the record. Having done so, we further hold there is legally and
factually sufficient evidence to support the trial court's implied findings that Stern and Cowan had the
requisite minimum contacts with the State of Texas during the relevant period of time. We further hold Stern
and Cowan have failed to present a "compelling case" that the exercise 

of specific jurisdiction over them will offend traditional notions of fair play and substantial justice.
Accordingly, we affirm the trial court's order denying Stern's and Cowan's special appearance.


 Sarah B. Duncan, Justice
1. After this appeal was perfected, the cause was transferred to the 113th Judicial District Court in Harris County,
Texas and assigned a docket number of No. 2003-24271.
2. Although the order on appeal was signed by the Honorable David Peeples, presiding judge of the 224th
Judicial District Court, the Honorable John J. Specia, Jr., presiding judge of the 225th Judicial District Court, presided
over the hearing and orally denied the special appearance.
3. But what to do when, as here, the trial court does not issue findings of fact or conclusions of law; and the
appellate record does not include a reporter's record? Certainly, we imply all findings in support of the judgment. But,
in the absence of a reporter's record, are these implied findings conclusively established? On this record, we think not,
because the trial court's order states the court denied the special appearance "[a]fter considering the pleadings on file
before the Court, and after hearing the argument and authorities of respective counsel." Because the trial court's order
indicates all the evidence before it is included in the clerk's record, a reporter's record is unnecessary to a sufficiency
review.
4. Calder v. Jones, 465 U.S. 783 (1984).
5. We do not decide in this case and express no opinion on whether the fiduciary shield doctrine may shield a
corporate officer or employee from the exercise of general jurisdiction.